298 So.2d 55

**Teddy BRODKA, alias**

**v.**

**STATE.**

**5 Div. 242.**

Court of Criminal Appeals of Alabama.

July 16, 1974.

William J. Baxley, Atty. Gen., and John M. Gruenewald, Asst. Atty. Gen., for the State.

TYSON, Judge.

The Grand Jury of Lee County, Alabama, charged the appellant with the first degree murder of his wife, Paula Joyce Brodka, "by shooting her with a gun or rifle." The appellant entered pleas of not guilty, and not guilty by reason of insanity. The Jury found the appellant "guilty of murder in the first degree, and fixed punishment at life imprisonment." The trial

Wayne P. Turner, Montgomery, for appellant.

court then entered judgment in accordance with this verdict.

The appellant, according to his testimony, had been having difficulties with his wife, as "she liked to go out, and he was hard up." They had been separated for a short time several months prior to the homicide.

The appellant, according to his brothers and his neighbors, had become "depressed." His wife had gone back, and they had lived together for several months prior to the homicide, which occurred on the afternoon of April 25, 1973.

The appellant testified as follows:

"Q. Go back to your house on Wednesday afternoon and tell the Court and jury what happened.

"A. Her mother said that she was going to take her home with her. So I went back to the bedroom and my wife was in there and I asked her if she was going to leave. She didn't say anything, but she shook her head, 'Yes.' I said, 'Paula, if you really loved me, you'd stay here.' I said, 'We've got that baby and everything we've worked for since we've been married is in this house.' And I said, 'In a few more months, we'll have our bills paid off.' And I said, 'We could make it work if you wanted to.' She said, 'No,' she was going to leave. Something just came over me. My heart started beating real fast. I don't know what I was doing. I just picked up the gun and I shot her with it.

"Q. Then what happened?

"A. The next thing I remember, me and Danny was fighting over the gun. I didn't know what was going on, the room just turned upside down and everything was a blur and blank and I heard shots going off and somehow I wound up on the floor and I had my head facing towards where my wife was laying and I saw her and I realized what had happened. So I ran over there and grabbed her and started screaming her name out and I heard Mrs. Hawkins come in there screaming, you know,—I mean, Mrs. Elliott. She was screaming, 'No, Danny, don't.' And I heard shots go off behind me and about that time something hit me in the back."

The appellant also presented the testimony of his brother and a neighbor friend that he had become depressed several months before when his wife had separated from him [R. pp. 162, 173].

The State presented the testimony of the deceased's brother, Dan J. Hawkins, and her mother, Emma Elliott, who had gone over to the home of the deceased and the appellant on the afternoon of Wednesday, April 25, 1973. According to Hawkins, the appellant came into the room and stated that he wanted to start the conversation as follows:

"A. The discussion was all around Teddy and Paula. Teddy came in and he said, 'I want to start the conversation by asking Paula did she ever run around' on him.

"Q. And what did Paula say?

"A. Paula said, 'No, Teddy, I haven't. I've never been out with anybody but you.'

"Q. Then, what was the discussion after that?

"A. It was just all around that and what this other party had said that led up to us being over there to begin with, for me to be over there to begin with.

"Q. Was there any discussion there at that time about your sister, Paula, and the defendant separating that day?

"A. Yes, sir.

"Q. Did they discuss a separation that day?

"A. Yes, sir.

"Q. Well,—

"A. Paula—

"Q. Go ahead.

"A. Excuse me. Paula was going to go out to Mother's house for a few days and they were going to think the problem over and then they were going to get back together and talk it out and try to come to some kind of conclusion as to whether to separate or try to make it together."

Thereafter, the appellant and his wife went back into the rear of the house and an argument began. Her brother, Dan Hawkins, testified as follows:

"Q. All right. What was said then?

"A. That's when Paula walked into the bedroom and Teddy followed and they were talking. And I don't know exactly what they said because at that time I got up and walked to the front door and I was standing at the front door, looking out and I could hear them talking but I couldn't make out what they were saying.

"Q. All right. So you were at the front door. It wasn't the door leading to the bedroom, but the door leading out the front of the house?

"A. Yes, sir.

"Q. And you say you could hear them talking but you couldn't hear what they were saying?

"A. No, sir.

"Q. Could you hear any argument between the two of them?

"A. They weren't arguing.

"Q. All right. What did you then hear, if anything?

"A. About that time, Mother said something to me and I told her to hush; you know, I was trying to hear what they were saying, and I couldn't make it out and about that time, I heard something sounded like—

"Q. Now, Dan—

"A. I heard something like Teddy knocking Paula up against—I heard Paula scream, 'No, Teddy, no!' And she screamed, 'No!' And about that time I heard something sounded like he was hitting her up against their thin closet door, just 'tap, tap, tap,' and I run and pushed Mother out of the way and run into the bedroom and he was standing up with the gun pointed at my sister's head; just standing right over her, shooting. And when I come through the door, he shot and turned around and fired at me. I jumped and kicked him and grabbed hold of the gun at the same time he fired at me, before I even touched it. And then we scuffled for the gun and I kept the gun pointed at the other end of the room from where my sister and my mother were, and Mother came running in and he swung the gun around towards her and I throwed him—we both went back up over on the bed and I was trying to unload the gun and get it away from him and get the safety on at the same time.

"Q. All right.

"THE COURT: Was your sister standing up or on the floor when you saw—

"THE WITNESS: My sister was laying on some clothes she was sorting out at the closet door.

"Q. Was that on the floor where you sister was laying?

"A. Yes, sir.

"Q. And where was the defendant at when you came into the door into the bedroom?

"A. He was standing right over her with the rifle.

"Q. With the rifle?

"A. It was up to his shoulder and he was aiming it right at her head.

"Q. What was he doing with that rifle?

"A. He was firing it at my sister.

"Q. At her head?

"A. Yes, sir.

"Q. Now, I believe you said you struggled with him to get the rifle away from him after that?

"A. Yes, sir."

The deceased's mother, Mrs. Emma Elliott, described the conversation with her daughter, Paula, the morning of the homicide, as follows:

"Q. While you were in the house that morning, state whether or not your daughter there, while you and your daughter, Paula, and their little girl, Rhonda, and the defendant were in the house, state whether or not your daughter made a complaint to you about something Teddy had done to her.

"A. Yes, sir. I went in the kitchen and I started washing some of her dishes and she come in there and she got ready and told me, she said, 'Mother, I can't live with Teddy no more after the way he done me last night.' She said, 'He beat me up last night.'

"Q. Did she show you any bruises about her body at that time?

"A. She had scratches on her neck and she showed me and her head was black right here (indicating) and had scratches and blue places on her arm and she said she had them on her body and she would show them to me after we got to work. And about that time—we wasn't whispering or anything, we were just talking, 'cause he was in there—I didn't—I liked Teddy. I didn't—and he was just in there and he walked around in there and got him a cup of coffee.

"Q. Did he say anything about what she was telling you?

"A. I don't think so. I don't know.

"Q. Did you ask him about what she had been telling you?

"A. See, he heard it, 'cause we was talking and he come through the kitchen door."

She testified that she went back with her son, Dan Hawkins, that afternoon, and that she saw her son go toward the bedroom where the deceased and the appellant were arguing:

"Q. All right. What occurred then, Mrs. Elliott?

"A. He turned and walked in the room. . And Dan was still at the door and I had worked that day and I was tired and I was doing like this (indicating) over there in the chair, and I heard shots. I heard—I heard her holler first; she said, 'No, no, Teddy; my God, Teddy, no, don't,' or something, in them words, somehow or another, 'No, no, Teddy, don't or 'No, no, Teddy,' or something. And so then she said, 'My God,' and then we heard the shots and went and started running to get in there. And when I went through the door—my son beat me.

"Q. Is that Dan Hawkins?

"A. Danny. And he beat me and he run in—and when I got in the room, well, they were holding—he had hold of the gun and he was bleeding, and Teddy had hold of the bleeding—

"Q. Who was bleeding?

"A. Danny was bleeding. And I stepped back because the bullet had went through my leg, and, you know, went across here. I felt it go across. And I looked down and I seen my daughter and she was laying down and had her head, and her hair was long and it was covered up and I didn't see no blood and I thanked God for that, and I just seen that hole in her leg and I said, 'Thank you—'

"Q. You saw what, Mrs. Elliott?

"A. I saw the hole in her leg where the bullet had entered and that's all I seen.

I didn't see no blood, I just seen her laying down, the hair over her face.

"Q. The hole was where, Mrs. Elliott?

"A. In her leg, it was in her leg. And I said—I thought she was all right because I didn't see no blood nowhere else, you know. I didn't see the blood; there was just a hole where a bullet had entered. And I said it out loud, 'Thank God Paula's all right.' But I knew he was trying to kill Danny, 'cause they was tussling and they had done went over there and Ted was about to get the best of Danny, 'cause Danny hadn't slept any and he was weak and Teddy is so much bigger than Danny, and I was saying, 'God, I thank you cause Paula is all right; now, God, give Danny strength and don't let him kill him.' And I was hollering, 'My God, Teddy, don't kill Danny, too; you hurt Paula; don't kill Danny, too.' And they went across the bed and Teddy—Danny was down in the floor and he had both of his feet in Teddy's chest holding on for dear life, and I thought sure—there was blood all over him and I knowed for sure he had done been shot in the stomach, and I got—after Teddy sat down on the side of the bed, I grabbed him around the neck and went to pulling him with all my strength and hollering for God to help me, and I went to screaming, 'Teddy, don't kill Danny; don't kill him. You hurt Paula, don't kill Danny, don't kill Danny.' And so I was holt of him, you know, and he jerked me loose. I guess he thought with both of us, he couldn't do nothing with us or I don't know what he thought, but anyway, Teddy jerked loose from me and stood up to run and Danny fell back and hit him in the back of the head with the butt of the gun and he fell on his knees and went right back where she was at and he went to groaning and hollering and Danny went to beating him on the head, hitting him, 'cause he was on Paula, we couldn't get him off of her. And I was hollering, 'Turn her a-loose, where we can get her to the hospital;

turn her loose, where we can get her to the hospital.' I didn't know, didn't know she was shot in the head and I went to shaking Danny. I said, 'Danny, leave him alone. Let's pull him off of her.' And so—

"Q. Just take your time, Mrs. Elliott.

"A. We pulled him back, and he sat back. He sat back in the floor and he was holding his head and Danny was reaching down to get Paula. He said, 'Mother, go get help,' and I ran for the telephone.

"Q. Did you look at Paula at that time?

"A. I still didn't see—her hair had her head covered. I got heart trouble, and I thank God he didn't let me see her head like that.

"Q. What did you do when Dan said, 'Go get help?'

"A. I run to the telephone—I went through and run to the telephone and when I turned around, Danny was coming through the living room with Paula, holding her like this (indicating) and I seen blood dropping, and I said, 'Danny, she's bleeding.' And Danny was coming through—coming through the hall and I called the operator and she said, 'Tell me what you want; tell me where I can help you.' And I asked Teddy, I said, 'Teddy, what's your address? What's your address over here?' And he told me and I tried to tell the operator and I said, 'I still can't tell her. Teddy, what's your address, again?' And he told me again. He was still just calm, like he had been all through, just as calm like he knowed what he was doing. He knowed what he was doing.

"Q. What occurred then?

"A. And Dan went to holler for me to come on, after I told the operator that,

and I hung the receiver up and run and got in the car.

"Q. All right. Then, did you notice—I believe you said you then noticed some blood about your daughter's head?

"A. Yes, sir. She was bleeding then and I noticed blood dropping but I didn't know whether it was coming from her head, you know, I couldn't see, 'cause her hair was long and it was down and he had her up like this (indicating)."

The testimony of Dan Hawkins and that of his mother, Emma Elliott, was corroborated by Linda Hawkins, the wife of Dan Hawkins.

The State also presented the testimony of Paulette Scott, the twin sister of the deceased, who testified that her sister had told her on the morning of the homicide, by telephone, that her husband, the appellant had threatened to kill her if she left him [R. pp. 56–58].

The State also presented the testimonies of several police officers who investigated the scene and made photographs. These officers further testified that they recovered seven .22 rifle hulls, and a broken .22 rifle with two "live shells" from the bedroom where the homicide took place.

Dr. Richard A. Roper, State Toxicologist, testified that death resulted from hemorrhage associated with gunshot wounds in the head area which penetrated the brain. He also identified the broken .22 caliber rifle, seven expended .22 caliber cartridge cases, and a piece of lead which appeared to be a bullet from behind the closet door in the bedroom [R. p. 123].

## I

The appellant's principal grounds urged for reversal was that the trial court in its oral charge charged [R. p. 204] that "there is no evidence in this case which would justify a finding of not guilty by reason of insanity."

In Manning v. State, 217 Ala. 357, 116 So. 360, Mr. Justice Thomas stated the rule governing this situation, as follows:

"The burden of proof or the duty of going forward with the evidence to establish, to the reasonable satisfaction of the jury, his plea of not guilty by reason of insanity, rested upon the defendant. Parrish v. State, 139 Ala. 16, 36 So. 1012.

"The rule of criminal liability vel non under such statutory plea is as was stated in Parsons v. State, 81 Ala. 577, 2 So. 854, 60 Am.Rep. 193, and adhered to in this jurisdiction. Wilkes v. State, 215 Ala. 428, 110 So. 908; Anderson v. State, 209 Ala. 36, 95 So. 171; Hall v. State, 208 Ala. 199, 94 So. 59; Whittle v. State, 213 Ala. 301, 104 So. 668; Lambert v. State, 207 Ala. 190, 92 So. 265; Umble v. State, 207 Ala. 508, 93 So. 531.

"The basis for the insistence of insanity under his plea was merely the action of appellant just prior to and at the time of the homicide. This was not sufficient to bring defendant within the rule of Parsons v. State, 81 Ala. 577, 2 So. 854, 60 Am.Rep. 193, and Anderson v. State, 209 Ala. 36, 95 So. 171. As observed in Wilkes v. State, supra, defendant may have had 'good reason for a state of mind with reference to' his wife and deceased a few minutes before the homicide, yet emotional or so-called moral insanity not associated with disease of the mind, as an excuse for crime, had no recognition in the law of this state. Anderson v. State, 209 Ala. 36, 95 So. 171; Parsons v. State, 81 Ala. 577, 2 So. 854, 60 Am.Rep. 193."

In the case at bar, two witnesses testified that the appellant had been depressed, or upset, several months prior to the homicide while separated from his wife. The appellant, himself, testified that he "didn't know what he was doing at the time of the shooting [R. p. 188]."

■ The burden of proof is on the appellant to support his plea of insanity. Walker v. State, 269 Ala. 555, 114 So.2d 402.

This situation was expressly covered by Mr. Justice Lawson in Walker v. State, supra, when he stated:

" . . . The words, 'something came in my mind to go get her,' are said to show that the defendant was moved by an irresistible impulse and therefore a jury question was presented as to defendant's sanity. Again we cannot agree with the insistence of counsel for appellant. The quoted words, in our opinion, do no more than show a decision or determination on the part of defendant to do the act for which he was tried and convicted.

"We hold that there was no evidence to support the insanity plea and that the trial court did not err in so instructing the jury and in declining in its oral charge to instruct on the law of insanity."

■ We agree here that there was no evidence of insanity before the court, and the trial court did not err in giving the oral instruction to which exception was taken. Griffin v. State, 284 Ala. 472, 225 So.2d 875; Knight v. State, 273 Ala. 480, 142 So.2d 899; Miles v. State, 50 Ala.App. 70, 277 So.2d 104; Johnson v. State, 43 Ala.App. 224, 187 So.2d 281; Rice v. State, 204 Ala. 104, 85 So. 437.

## II

■ The photographs taken by the investigating officers of the bedroom and house, the scene of the homicide, that afternoon were properly admitted in evidence. Smarr v. State, 260 Ala. 30, 68 So.2d 6; Nichols v. State, 267 Ala. 217, 100 So.2d 750.

The fact that some of the photographs of the deceased showed blood on her did not make them inadmissible. *Nichols,* supra.

## III

■ The appellant also urges that the trial court abused its discretion when it allowed the brother of the deceased, Dan Hawkins, to sit at counsel table with the prosecuting attorney after the close of the State's case during the presentation of the appellant's case. The rule covering this was stated by Mr. Justice Tyson, in Hall v. State, 137 Ala. 44, 34 So. 680, as follows:

" 'When witnesses are placed under the rule, it is discretionary with the presiding judge to permit exceptions to its enforcement.' Riley v. State, 88 Ala. 193, 7 So. 149; McGuff v. State, 88 Ala. 147, 7 So. 35, 16 Am.St.Rep. 25; Barnes v. State, 88 Ala. 204, 7 So. 38, 16 Am.St. Rep. 48. So, too, it is discretionary with the trial court to allow a witness against whom the rule was enforced to testify. . . . "

See also, Webb v. State, 100 Ala. 47, 14 So. 865; Jarvis v. State, 138 Ala. 17, 34 So. 1025; McDowell v. State, 238 Ala. 101, 189 So. 183; Smarr v. State, 260 Ala. 30, 68 So.2d 6; Nichols v. State, 267 Ala. 217, 100 So.2d 750; Elrod v. State, 281 Ala. 331, 202 So.2d 539.

Here, the State had closed its case, and the witness Hawkins had been excused from the rule. We see no abuse of discretion in the trial judge allowing the brother of the victim to be present at the counsel table during the presentation of the appellant's case. Cases herein cited.

We have carefully examined this record, as required by Title 15, Section 389, Code of Alabama 1940, and find same to be free from error. The judgment is due to be and the same is hereby

Affirmed.

ALMON, HARRIS and DeCARLO, JJ., concur.

CATES, P. J., not sitting.