The indictment in this case charged the appellant with unlawfully and with malice aforethought having killed Johnny James Tyner "by shooting him with a pistol." The jury returned a verdict of guilty of murder in the second degree, fixing punishment at fifteen years imprisonment. The trial court set sentence accordingly.
Officer Jay Hardy, a Montgomery City police officer, testified that, during the early morning hours of April 17, 1977, he and his partner responded to a call concerning an alleged shooting at the Harlem Inn on High Street in Montgomery. Officer Hardy stated that, upon their arrival, he found a man slumped across the front of an automobile parked in front of the Harlem Inn. Having ascertained that the man had been shot, Officer Hardy summoned the paramedical squad to the scene. Officer Hardy indicated that he searched the surrounding area for a weapon, or any other possible evidence, but found nothing of that nature.
Louise Tyner testified that she was the mother of the deceased, Johnny James Tyner. Mrs. Tyner identified State's Exhibit One as being a photograph of the deceased, who died on April 17, 1977.
Ben Time, Jr., testified that he was at the Harlem Inn on the morning of April 17, 1977. As he was leaving the Harlem Inn, he met the appellant and the appellant's brother, George Barnes, Betty Floyd, Betty Bauldwin, Ann Young, and one Jessie as *Page 391 
they were entering the Harlem Inn. Mr. Time stated that he decided to stay a while longer at the Harlem Inn because he had arranged to ride to his home with someone in this group. Accordingly, Mr. Time went back into the Harlem Inn and seated himself at the table with his newly-found companions. Mr. Time recalled that the deceased, Johnny James Tyner, came over to their table and conversed with Betty Bauldwin. Sometime later, the appellant, his brother, Betty Floyd, Betty Bauldwin, and Mr. Time decided to leave the Harlem Inn (Ann Young and Jessie had left earlier). Betty Bauldwin and the appellant's brother were the first members of the group to walk out of the Harlem Inn. They were followed by Ben Time, Betty Floyd and the appellant. As these three were making their exit, the deceased followed them, saying something to Betty Floyd as they walked. Mr. Time indicated that Betty Floyd repeatedly told the deceased not to bother her.
On the sidewalk in front of the Harlem Inn, the appellant told the deceased to "Go ahead on, man" (R. p. 25). The deceased responded by calling the appellant a "country s.o.b." (R. p. 25). Mr. Time testified that it was at this point that the appellant turned around and saw the deceased, who had a knife in his right hand. The appellant drew his pistol, pointed it at the deceased, and warned him again. The deceased took a step forward, and the appellant fired one shot, fatally wounding Tyner. Mr. Time testified that he and Betty Floyd stood approximately four feet from the incident. At the time of the shooting, Betty Bauldwin and the appellant's brother were almost to the parking area some distance away. Immediately after the shooting, according to Mr. Time, the appellant said, "Let's go," and the group left in two automobiles. Mr. Time left with Betty Bauldwin and Betty Floyd while the appellant and his brother drove away in another automobile.
On cross-examination, Mr. Time testified that he did not know what had happened to the knife that he saw the deceased holding just prior to the shooting. He stated further that the appellant and the deceased had not conversed inside the Harlem Inn before the shooting took place. Mr. Time indicated that the appellant turned and faced the deceased for about two minutes before he fired the fatal shot.
Betty Bauldwin testified that, on the morning of April 17, 1977, she had occasion to be at the Harlem Inn in the company of Betty Floyd, Ben Time, the appellant, Willie James Barnes, appellant's brother George Barnes, Ann Young, and her boyfriend. Ms. Bauldwin testified that, while she and her companions were seated at their table inside the Harlem Inn, the deceased, Johnny James Tyner, came over to their table and conversed with her. Ms. Bauldwin repeatedly tried to avoid the deceased's advances by leaving the table and walking away. Finally, Ms. Bauldwin decided to leave and asked Betty Floyd to accompany her. Then Ms. Bauldwin walked out of the Harlem Inn ahead of the others in the group. Ms. Bauldwin stated that she overheard the deceased and the appellant arguing just outside the entrance to the Harlem Inn. When Ms. Bauldwin heard the shot, she turned around and saw the deceased fall. At this point, Ms. Bauldwin was approximately twenty or thirty feet away. Ms. Bauldwin stated that she was not in a position to see whether the deceased had a knife because she did not turn around until she heard the shot. During cross-examination, Ms. Bauldwin related a past experience which tended to show that the deceased had been known to carry a knife on his person.
Dr. Richard A. Roper, State Toxicologist, testified that he performed a post-mortem examination on the body of Johnny James Tyner. Dr. Roper identified State's Exhibit Two as being a photograph which he took of the deceased at the time of his examination. Dr. Roper testified that the cause of death was sudden massive internal bleeding, resulting from a single gunshot wound to the chest. Dr. Roper recovered a bullet from the deceased's body, which he turned over to Tom Hopin, evidence technician in the laboratory of the State Toxicologist's *Page 392 
Office. Dr. Roper stated that he received a sample of the deceased's blood from the Ross Clayton Funeral Home. Analysis revealed that the blood sample contained .25 percent ethyl alcohol. Dr. Roper stated that a person with such level of alcohol in his blood is legally intoxicated and would speak with a thick tongue, stagger, etc.
On cross-examination Dr. Roper indicated that a person with .25 percent alcohol in his blood would possibly be belligerent, pugnacious, and likely to provoke difficulties.
Tom Hopin testified that he received a .25 caliber bullet from Dr. Roper. The bullet was marked as State's Exhibit Three and identified by Mr. Hopin. State's Exhibit Four was a .25 caliber pistol. Based upon his training and expertise in ballistics, Mr. Hopin testified that the results of his ballistic comparison of State's Exhibits Three and Four indicated the bullet, given to him by Dr. Roper, was fired by Exhibit Four to the exclusion of all other weapons.
On cross-examination, Mr. Hopin stated that he acquired possession of State's Exhibit Four when it was delivered to him by C.O. Bolden of the Montgomery Police Department.
The next witness for the State, Betty Floyd, substantially corroborated the testimony of Ben Time concerning the events leading up to the shooting on the morning of April 17, 1977, in front of the Harlem Inn. Ms. Floyd stated that she saw the deceased with a knife in his hand immediately prior to the shooting. But, contrary to Mr. Time's testimony, Ms. Floyd did not recall an argument between the deceased and the appellant prior to the shooting. Ms. Floyd stated that she was distantly related to the deceased and had been seeing the appellant socially for about a month. According to Ms. Floyd, the appellant and the deceased were about three or four feet from each other at the time of the shooting. Ms. Floyd did not see any people other than the members of her party at the scene of the shooting.
Robert J. Humphrey testified that he was at the Harlem Inn on the morning of April 17, 1977. Mr. Humphrey stated that his automobile was parked directly across the street from the Harlem Inn, facing east. When he left the Harlem Inn, Mr. Humphrey got into his automobile, drove to the service station and turned left into it so that he could turn around to drive west on High Street. As he was waiting for traffic to pass before he re-entered High Street, Mr. Humphrey witnessed the shooting from a distance of about twelve or fifteen yards. Mr. Humphrey stated that he saw the appellant walking hand in hand with a woman and the deceased following about five feet behind them. According to Mr. Humphrey, the appellant suddenly let go of the woman's hand, reached to his side for his pistol, and turned around facing the deceased. Mr. Humphrey said the appellant then aimed and fired. Mr. Humphrey did not see a weapon in the deceased's hand, nor did he say that the deceased advanced on the appellant prior to the shooting. Mr. Humphrey testified that, immediately after the shooting, the appellant walked to the deceased, looked down at him, and then walked away with the others in his party. Mr. Humphrey immediately reported the incident to the Montgomery Police by way of his citizens' band radio. Later that morning, Mr. Humphrey gave a statement to the police.
Reginald James Phillips testified that he was in Mr. Humphrey's automobile, seated on the passenger's side, at the time of the shooting. Mr. Phillips' account of the incident substantially corroborated that of Mr. Humphrey's. Mr. Phillips gave a statement to the police at the scene of the incident.
Montgomery Police Detective Robert H. Hankins testified that he investigated an alleged shooting at the Harlem Inn on the morning in question. At the scene of the incident, Detective Hankins interviewed Mr. Humphrey and Mr. Phillips.
At the Baptist Hospital, Detective Hankins received from hospital personnel the clothing of the deceased. Detective Hankins testified that he searched the deceased's clothing and did not find a weapon. On April 18, 1977, Detective Hankins arrested the appellant at his place of employment. *Page 393 
At the time, Detective Hankins informed the appellant that he was under arrest for murder and informed him of his Miranda
rights. Detective Hankins stated that the appellant indicated he understood his rights. The appellant then made a statement to Detective Hankins, who stated that no threats, force, coercion, inducement, or hope of reward, were made or offered to the appellant to obtain a statement from him. Detective Hankins then related to the jury the substance of the appellant's oral statement as follows (R. p. 137):
 "A. In his oral statement he said that he was in fact the person who had shot the individual in question the preceding morning. He told me that the person, he thought, had had a knife and was coming at him with a knife and that he was acting in self defense."
Detective Hankins then identified State's Exhibit Four as being the weapon that he found in the appellant's automobile on the morning he was arrested. The weapon was later given to the State Toxicologist by Officer Bolden.
Detective Ricky Mobley testified that he accompanied Detective Hankins during his investigation of the shooting in question and that he was present at the time of the appellant's arrest. Subsequent to the appellant's oral statement to Detective Hankins, Detective Mobley advised the appellant of his Miranda rights at the police station prior to taking a written statement. Detective Mobley identified and read to the jury State's Exhibits Six and Seven, which were respectively the standard Miranda rights forms used by the Montgomery Police Department and the appellant's signed written statement.
After the trial judge admitted all the State's exhibits, the State rested its case. The defense then moved to exclude the State's evidence, which motion was denied by the trial judge.
The first defense witness was William B. Grant, who was sales manager at the appellant's place of employment. Mr. Grant testified that he had known the appellant for four or five years and attested to the appellant's good character. On cross-examination, Mr. Grant stated that his testimony on direct examination would have been different had he known that the appellant had been arrested for aggravated assault in 1975.
The final witness for the defense was the appellant. In his account of the incident, he admitted shooting the deceased, who advanced on him with a knife. The appellant explained that he told the police he thought the deceased had a knife because the police told him that there was no knife found. The appellant stated that he faced the deceased for two or three minutes before he shot.
 I
The appellant argues that the trial judge erred in allowing the State to impeach its own witnesses on two occasions over objection of defense counsel. The pertinent portion of the record appears as follows (Redirect examination of Betty Floyd, R. p. 89):
 "Q. And you didn't talk to the police or give the police a statement until two days later?
"A. That is right.
 "Q. You didn't tell them — you didn't wait around and tell them the story — at least what you testified here immediately after —
 "MR. SHINBAUM: We are going to object to this. This is his witness. He cannot impeach his own witness.
"THE COURT: Sustain the objection."
It is well settled in the law of this jurisdiction that a party may not impeach his own witness. Flournoy v. State,270 Ala. 448, 120 So.2d 124 (1960), on remand, 40 Ala. App. 629,120 So.2d 121 (1960); Abernathy v. State, 42 Ala. App. 149,155 So.2d 586 (1962); and cases therein cited.
Accordingly, the trial court properly sustained defense counsel's timely objection in the excerpt above quoted. It appears, therefore, that there was no adverse ruling of which to complain on appeal. Veith v. State, 48 Ala. App. 688,267 So.2d 480 (1972); *Page 394 Boyett v. State, 18 Ala. App. 363, 92 So. 515 (1921).
The appellant argues that the State was improperly allowed to impeach its own witness on another occasion during redirect examination of Betty Bauldwin. The pertinent portion of the record appears as follows (R. p. 113-114):
 "Q. While you were in the club there, this man who was bothering you all night and you didn't want to talk to him, did you ever dance with him?
"A. I think I danced with him one time.
"Q. How many times did you dance with him?
"A. One time.
 "Q. Ms. Bauldwin, do you think you can testify accurately — it was your testimony this morning that Sunday night after the shooting you gave the police a statement. Is that correct?
"A. Yes, sir.
 "Q. Do you think you can testify accurately to everything you told the police or would you need some document to refresh your present recollection?
 "A. I can testify to what I told them that same night.
 "Q. Okay. Then, again, based on your statement that you can testify accurately to what you told the police, do you recall now how many times you danced with —
 "MR. SHINBAUM: Your Honor, I would like to make an objection at this time. This is his witness, if he is trying to impeach this witness, I would like to have him make a showing outside the presence of the jury so we can voice an entire objection to this line of questioning of this witness.
"THE COURT: Overruled."
In McMillian v. State, 268 Ala. 363, 106 So.2d 244 (1958), the Supreme Court of Alabama stated, quoting from White v.State, 87 Ala. 24, 5 So. 829:
 "`A party may ask his witness, for the purpose of refreshing his memory or of showing that he has been put at a disadvantage by unexpected evidence, whether, at a certain time and place, he has not made certain statements inconsistent with his testimony on the stand, even though the admission of such inconsistent statements will injuriously affect the witness' credibility with the jury. Campbell v. State, 23 Ala. [44] 77; Hemingway v. Garth, 51 Ala. 530; [Roscoe's] Crim.Ev. 103; 1 Green, Ev. § 444. While this cannot be done, when the purpose and only effect of such evidence is to impeach the witness (Gandy v. State, 81 Ala. 68, 1 So. 35); yet, the mere fact that the party expects the witness to admit the contradictory statements is not sufficient to show that the purpose and sole effect of the examination is to impeach the witness or to justify the exclusion of the testimony. * * *'"
Clearly, the prosecutor's purpose in the instant case was to refresh the present recollection of the witness whose response was inconsistent with a prior signed statement. We find no error in the trial judge's ruling and, therefore, no merit in the appellant's contention.
 II
The appellant next contends that the trial judge should have granted his motion to exclude the State's evidence on the ground that the evidence established the defense of self-defense.
In Griffin v. State, 49 Ala. App. 502, 273 So.2d 478, cert. denied, 290 Ala. 366, 273 So.2d 481 (1973), this Court stated:
 "Briefly, the elements of self defense are (1) that the defendant must be free from fault in bringing on the fatal difficulty; and (2) that there must be a present impending peril to life or danger of great bodily harm, either real or so apparent as to impress on the mind of a reasonable person a reasonable belief of an existing necessity to take life, and the defendant must so believe; and (3) that a man as required by law must, though he may be free from fault and though he may be in danger, either real or apparent, of losing his own life or receiving serious bodily harm, flee or retreat if by retreating he *Page 395 
could prevent the taking of life and not increase his own danger.
. . . . .
 ". . . It is elementary that one need not retreat from his or her own home. . . ." Griffin, supra, at 504, 273 So.2d at 480.
In the instant case, the evidence was in conflict as to whether the deceased, in fact, had a knife. The existence of this fact was material to the second element above stated. The determination of this issue presented a question for the jury.Higginbotham v. State, Ala.Cr.App., 346 So.2d 525 (1977). Furthermore, it is clear from the evidence that the jury could have found that the appellant could have retreated safely.
Where the evidence is sufficient to present a question for the jury, there is no error in the trial court's denial of a motion to exclude the State's evidence. Young v. State,283 Ala. 676, 220 So.2d 843 (1969).
 III
The appellant asserts that the trial court erred in allowing Dr. Roper, the State Toxicologist, to give his opinion as to the type of behavior a person with a certain percent of alcohol in his blood would demonstrate. As grounds for this contention, the appellant argues that a proper predicate was not laid in the trial court in that it was not shown who drew the blood sample, or when it was taken, or the conditions under which it was taken. The objection in question comes following Dr. Roper's testimony as to the cause of death (R. pp. 63, 64):
 "Q. Now, based on your examination of the deceased, do you have a professional opinion as to the cause of death of Mr. Tyner, please?
"A. Yes, sir, I do.
"Q. What is the cause of death, in your opinion?
 "A. Based on my examination of the body and internal organs of the body it was my opinion that death resulted from an acute internal hemorrhage, or sudden massive bleeding within the body subsequent to a single gunshot wound in which a major artery and several organs were penetrated.
 "Q. Did you or anyone in your presence take a blood sample from the body of Mr. Tyner, please?
 "A. I received a blood sample from Ross Clayton Funeral Home.
 "Q. Did you or anyone in your presence or under your direction or supervision perform an analysis of that blood specimen to determine whether or not there was any ethyl alcohol contained in the blood sample taken from Mr. Tyner?
 "MR. WALDEN: We object to him testifying what was found there. There is not the proper connection, there is not the —
"THE COURT: Overruled.
"Q. Did you, sir?
"A. Yes, sir.
 "Q. And what was the result of that examination or analysis?
 "A. Analyses of the blood specimen revealed ethyl alcohol to be present in the blood at a level of .25 percent.
 "Q. Now, Dr. Roper, are you familiar with the law in Alabama as to when one is presumed to be under the influence of alcohol, or intoxicated?
"A. Yes, sir.
 "Q. And what — based on your familiarity with that law, what is that percentage or level, please?
"A. This level is .1 percent.
 "Q. Therefore, the ethyl alcohol in the bloodstream or blood of Mr. Tyner far exceeded the legal level when one is presumed to be intoxicated; is that correct, Dr. Roper?
"A. Yes, sir, that is correct."
In examining the objection, above quoted, and also the one appearing on Record page sixty-four, we find that nowhere did counsel assert in the trial court, or call to the trial court's attention that a proper predicate had not been laid for Dr. Roper's testimony as to the blood alcohol content in the deceased's blood. *Page 396 
The objections were; (1) there was no proper connection, and (2) there was no "connection shown to this case as far as that activity." Here, Dr. Roper's qualifications had been waived and were moreover established by his testimony, and, secondly, he personally performed the autopsy on the deceased's body. Clearly, therefore, there had been established a proper connection between Dr. Roper and the deceased insofar as this case is concerned.
Moreover, during the cross-examination of Dr. Roper by counsel, it was established that a person with a .25 percent blood alcohol level would "walk at a staggering gait; his speech would be slurred; and his coordination would be impaired," but that a person in this condition would still be capable of drawing a knife, cursing, and capable of attacking another person.
In this state of the record, we cannot ascribe reversible error to this questioning. In fact, if anything, such examination was beneficial to the appellant because it established the basis for the deceased's alleged aggressiveness.
As stated in Kennedy v. State, 291 Ala. 62, 277 So.2d 878:
 "It is well established that under Rule 45 an appellant must not only show error but must also demonstrate that such error was probably injurious. State v. Hodge, 280 Ala. 422, 194 So.2d 827; Kabase v. State, 244 Ala. 182, 12 So.2d 766 . . ."
 IV
The appellant's final contention is that the trial judge erred in refusing to give several of appellant's requested written charges. The appellant asserts that these charges were correct statements of the law and not substantially covered by the trial court's oral charge.
We have carefully reviewed the learned trial judge's oral charge to the jury. In his charge, the trial judge was meticulous in his explanation of the applicable law. We note specifically that the oral charge on the defense of self-defense was completely satisfactory. After reviewing each of the appellant's written requested charges, we find that they were either affirmative in nature or not properly predicated on the evidence in this case, or were fully and substantially covered in the trial court's oral charge. Section 12-16-13, Code of Alabama 1975. Morrow v. State, 52 Ala. App. 145,290 So.2d 209, cert. denied, 292 Ala. 743, 290 So.2d 213 (1973).
We have carefully examined this record and find same to be free of error. The judgment is therefore
AFFIRMED.
All the Judges concur.