Murder, second degree; thirty years.
The appellant was indicted by the Calhoun County Grand Jury for the murder of Rodney Paul James, by shooting him with a shotgun.
In support of this indictment the State presented the following evidence.
Sherry Roberts, the victim's girlfriend, testified she spent the night with Rodney James before the morning of the shooting. She and the victim took the drug "PCP" that night, and then slept soundly. The following morning, she and James went to the house trailer of appellant and his wife, Sheila Lehr. James and appellant left for a short while and returned with milk and a *Page 793 
package of disposable hypodermic syringes. When they returned to the trailer, they took two of the syringes and stated they were going to Ohatchee. The two men left in appellant's truck, while Ms. Roberts remained at the trailer with Sheila Lehr.
Two or three hours later, appellant returned to the trailer alone and told Sherry and Sheila that he left the victim at the creek because he had "O.D.'d" on methedrine. Appellant said he was going to get someone and go back to see if the victim was alive. He left, and then returned some forty-five minutes later and stated that Rodney James was dead. He also had the victim's ring with him and offered Sherry the ring, which she refused. He told her to keep her mouth shut and he would take anything from the victim's body she wanted. Appellant then took Sherry Roberts to her house and left her there.
The story appellant told Sherry Roberts and Sheila Lehr as to the victim's death began to unravel when witness, Clyde Carlisle, found the victim leaning on a car parked on the Ohatchee road on the same afternoon of July 18, 1978. The victim appeared to have been bleeding badly from two gunshot wounds and a gash on his forehead. He was still bleeding and was very white and weak. The victim told Carlisle that appellant had shot him. Mr. Carlisle then took the victim to the Fuller's Bait Shop, where an emergency unit came and picked up the victim.
Joe Fincher, Chief of the Alexandria Fire Department testified he went to Fuller's Bait Shop in answer to a reported shooting. Chief Fincher, an emergency medical technician, rendered aid to the victim. He said James was sitting in a chair, semi-conscious, and bleeding badly. When questioned by Fincher as to who shot him, James responded that appellant Lehr had shot him. The victim stated that Lehr had shot him "on purpose," as opposed to accidentally, and that he had taken no drugs or medication. Chief Fincher observed the victim to be in bad shape and close to death.
Deputy Sheriff Jerry Chandler participated in the investigation of the shooting of Rodney James. Chandler testified he went to the appellant's trailer approximately forty-five minutes after learning of the shooting. Appellant answered Deputy Chandler's knock and came out into the yard where he was advised of his rights. At appellant's request, he was taken to the sheriff's office. Deputy Chandler informed him of his rights again in the presence of Officer Jerry Kelley. Appellant then made the following statement to the officers which was reduced to writing and admitted into evidence at his trial:
 "I Michael David [sic] Lehr have been knowing Rodney Paul James for about three years, maybe 4 years. We had done drugs together before, just a day or so after the robbery of Regional Medical Center Pharmacy. Rodney Paul James asked me if I would hide some drugs. We agreed and I met him at the Shell Service Station on Highway 431 at the Highway 62 intersection and he gave me a plastic bag full of drugs. I carried the drugs down beside the creek and buried them. Rodney and I would get together about every day and go out there and do some of the drugs. Rodney and Ronald Wayne Ritter were the ones who did the robbery at the hospital and Waymon Knighton was the one who planned it. Rodney was arrested for the robbery and later released on bond. Someone else thought Rodney was going to testify against Waymon Knighton and on Sunday July 16, 1978 at about dark a big man came to my trailer and knocked on the door. I opened the door and he said I want to talk to you and we stood outside the trailer, he said you know about (Rod) Rodney if he opens his mouth about Knighton he is dead as a Micreal [sic] anyway. And you have got a mighty nice little boy there if you want to keep him you better have a searce [sic] talk with Rod. And he walked off. I had to make a trip to Ky. so I left at 8:30 P.M., July 16, 1978. I got back at 7:20 July 17, 1978. At 9:00 A.M. July 18, 1978, Rod came to my trailer, we stayed there about an hour then we left and went to the *Page 794 
creek. We always carry the shotgun with us and we went to the hardware store in Jacksonville and got a box of shells, but before we bought the shells we went to Boozers Drug store and got some disposal needles. We went to the creek and did some drugs. We just sat on the creek bank and talked and shot the shotgun into the creek. We talked about Rod testifying against Waymon Knighton and he said he didn't know if he would or not that his life had never been on the line before. I loaded the shotgun and was holding it in my hands and it went off and hit Rod in the back and side, it scared me so bad I didn't know what to do and I was messed up on drugs. I talked to Rod for a minute or two and he said help me man and I helped him to the truck and let the tailgate down and put him the back of the truck. I stopped and wet a rag and put it on his face. About that time we started struggling and he was wild so I went to the front of the truck and got my shotgun and reloaded it. Rod was right on me and he was talking real loud and I told him to get back in the truck but he just kept coming toward me and grabbed a holt [sic] of me and I shot him again. Rod was laying [sic] on the ground and I sat down beside him and talked to him for a minute and he asked me to get the wet rag and I did and wiped his face off. He asked to see a picture of his little girl and I got his billfold out and showed him the picture. When Rod got quite and stopped talking I left him and went up the side of the mountain and hid the shotgun. It was broken down in three pieces. Then I went back to where Rod was, I stayed there about 15 minutes then I left and rode around for a few minutes and then I went home. I stayed around the house for awhile then I went into the bathroom and changed pants because the ones I had on had blood on them. I put those pants in the dirty close [sic] hamper. Shortly after that (about 20 minutes) the deputies came to the trailer. . . ."
After making the statement, appellant took the officers to the area of the shooting near the Tallaseehatchee Creek in Calhoun County. There he showed the officers a drug stash alongside a dirt road where drugs and empty drug wrappers were found. Farther along the road appellant pointed out where the victim's body had been lying when he left him and where the shotgun was buried in two pieces under leaves. About one-half mile farther, appellant led the officers off the road and across two fences, down to the creek bank. There they found one sixteen-gauge spent shotgun shell and two unopened and unused hypodermic needles. They also observed a great deal of blood at the scene.
Deputy Allen Reese testified to receiving a ring and a wallet during the course of the investigation. The wallet, which he received from Deputy Chandler, was one identified by Chandler as having been found in a tissue box on the dash of the truck driven by appellant the day of the shooting. Reese stated the wallet contained an Alabama driver's license with James' picture on it. The ring was given to him by Ms. Laura James, the victim's wife, who identified it as belonging to Rodney James. She stated the ring was given to her after James' death by Sheila Lehr, appellant's wife.
Deputy Reese also testified that the drugs in the stash referred to by Deputy Chandler were hidden there by appellant for a Waymon Knighton, who had stolen the drugs from the Regional Medical Center Pharmacy. The victim and appellant were then "ripping him off," by taking Knighton's stolen drugs for their own use. Reese also identified pictures of the victim, showing the nature and location of the shotgun wounds, which he had taken during the investigation.
Laura James testified to having seen her husband, dead, at the funeral home on Wednesday after he was killed on Tuesday. On cross-examination, she stated her husband did have several knives and carried one sometimes. She had been separated from her husband for about three weeks at the time of his death. She had never seen her husband take drugs, but did know of his *Page 795 
close friendship with appellant, and identified pictures of Lehr and James fishing together.
Joseph Embry, a pathologist for the State, conducted a post-mortem examination of Rodney James on July 19, 1978. He discovered two shotgun wounds, one in the right arm and right chest, and the other in the right lower back. There were also bruises and deep lacerations on the victim's forehead. The cause of death was a gunshot wound to the chest with pellets in the heart, which compressed the heart by causing the sack around the heart to fill with blood. A piece of leather, which appeared to be belt leather, was found in the right chest. Test records indicated no detectable amount of any drug was present in the victim's system.
Chip Walls, a toxicologist for the Alabama Department of Forensic Sciences, testified he examined the victim's blood, urine, and bile for evidence of drugs in the victim's body. No drugs, "PCP" or otherwise, were shown by the test to be present in the body.
Lawden Yates, a firearms examiner for the State, testified concerning a shot cup, wadding, pellets, and one six-gauge shotgun he received in connection with the Rodney James case. He testified the pellets labelled as having been removed from the victim were consistent with wadding material that is common with sixteen-gauge shotgun shells. He also performed tests on the victim's shirt and found no gun powder residue.
At the end of Mr. Yates' testimony, the State rested and the appellant made a motion to exclude the evidence on the grounds that the State had failed to prove a prima facie case of murder in the first degree. The motion was denied and the appellant called a number of character witnesses.
Chi Chi Leffel, a former neighbor of the victim, testified to the victim's untruthful and violent reputation. Sheila Lehr, the appellant's wife, testified the victim was violent, quick-tempered, and often carried knives. She stated that Rodney James appeared to be on "dope" the morning of the shooting and had smoked marijuana in her presence that morning. She testified also that appellant and James, close friends, had taken four or five syringes with them in the morning of the shooting. She also confirmed that appellant had said James had "O.D.d" when he returned from the creek without James.
Donald Lehr, appellant's brother, testified to Rodney James' bad reputation for truth and veracity and violence. Robert Warnock, Sr., and Inez Leffel, neighbors of the victim, testified to James' untruthful and non-peaceful reputation. Steven Babcock, who went to school with James, testified to his bad reputation for violence.
Dr. Marshall Stout, a physician practicing emergency medicine, was called by the defense to testify concerning the nature and effect of the drug, "PCP" or Phencyclidine. He testified about its anesthetic qualities, as well as to the extremely unpredictable, erratic, and violent behavior it can cause in persons using the drug. He stated it is an easily made drug and is widely abused by street pushers and drug users. He also stated the drug is very hard to detect in the human body and can cause profound effects, even when the amount of the drug in the body is undetectable to the most sensitive tests. He said that "PCP" can cause delayed behavioral manifestations some hours to months after its use, resulting in accidents or violent antisocial acts. He testified that "PCP" is more readily detected in the gastric juices, but may be apparent in the bile, blood, or urine.
Michael Dennis Lehr took the stand to testify in his own defense. He stated that Rodney James was very quick-tempered and frequently carried a knife. He also testified to the victim's violent nature and gave examples of the victim's past violent acts against the victim's wife and others. The appellant admitted the sixteen-gauge shotgun was his. He testified that Waymon Knighton was involved in the hospital pharmacy robbery, and that Rodney James was also connected and pending trial for the robbery at the time he died. He stated he showed Knighton where to hide the stolen *Page 796 
drugs, and that he and Rodney James later removed them to the location he showed the investigators. Knighton did not threaten him or his family in relation to the drugs or Rodney James, according to appellant's testimony. He also testified he and Rodney James took a sixteen-gauge shotgun, a box of shells, and four or five syringes to the creek the day of the shooting and that they both smoked marijuana and injected "PCP." His version of the infliction of the wounds appear in the record as follows:
"Q. Did the gun go off and hit Rodney?
"A. Yes.
"Q. Explain to the jury how that occurred.
 "A. I was breaching the gun to load another shell in it. The hammer was back and I put a shell in it and when I snapped the gun closed my finger pulled the trigger and hit Rod in the back side. It went to the front and hit him on the arm.
 "Q. And where was he in relationship to you at that time?
 "A. On my left. He started to get up and turn to get a coke out of the truck. When the gun went off and hit him he fell face first on the ground. He rolled over and I threw the gun down. I went over and I was scared and didn't know what to do.
"Q. Did he say anything then?
 "A. Yes. The first thing he just laid there for a little bit. He didn't holler or scream or anything. He asked me if I would give him something to drink so I ran up to the truck and got a coke and there was a pillow case in the truck and I brought it back and wet the pillow case in the creek. While Rod was drinking his coke I put the pillow case on his face. He had all turned white and had a cut on his head and blood was on his face. He asked me if I would look and see how bad it was and then I looked.
"Q. What did you do then, Dennis?
 "A. Rod, was trying to take his belt off so I pulled it off and wrapped it around the arm that the buckshot had torn up.
. . . .
"Q. Then what happened?
 "A. I went up and got the pickup truck and backed it down to the edge fence and went back down and got Rod and got him up and I helped him up to the pickup truck and laid him down in the back where he could lay down and we started out.
"Q. Anything happen on the way out?
. . . .
 "A. When we got up to the top of the hill where they have the road split where the little turn goes around there all of the time I was driving I had to turn and watch Rod and watch the road. When I got up the hill I turned into the place about as far as that number four (indicating) and the other end I thought that you could just shoot around it and shoot right back in it. I wanted to stop because it was level ground back there.
"Q. What happened then?
 "A. As soon as I got the truck stopped Rod had done got out of the back of it and was hollering and screaming and he wasn't saying any particular thing. I couldn't make any sense out of it. I got out of the truck and I told him to stop hollering that it was just hurting him that much more. I told him to get back in the truck and I would carry him to the hospital.
"Q. Where were you trying to take him at the time?
"A. To the hospital.
"Q. How long after you had taken PCP did this occur?
"A. I would say twenty or thirty minutes.
 "Q. After he got out of the truck and you were trying to convince him to get back in the truck what occurred?
 "A. He started to come at me and I couldn't figure out why and I told him to get away from me and get back inside the truck. I said, `I'm scared, Rod, and I don't know what I'm doing. Just get back in the truck and stay away from me.' I didn't want him close to me because he wasn't making sense and he didn't look like himself. *Page 797 
"Q. Were you afraid at that point?
"A. Yes, sir.
"Q. Was he coming at you?
"A. Yes, sir.
"Q. What did you do at that point?
 "A. I just kept backing up and then I went around and got the gun out of the truck. I don't know why.
"Q. What happened then?
 "A. I come back around and I told Rod to get back in the truck and I would carry him to the hospital. He still wouldn't listen and he come at me and he grabbed me and I had the shotgun in one hand laying straight against the ground. The barrel was laying straight against the ground. I tried to get loose and when I did get loose —
"Q. Then what happened?
 "A. I raised the gun and fired at Rod's arm across here. (INDICATING)"
He stated he then hid the shotgun, believing James was dead. He admitted telling Sherry Roberts and his wife, Sheila, that James died of an overdose. The defense rested, and there was no rebuttal by the State.
 I.
Under the evidence presented at trial, we are persuaded that a question was presented for the jury as to whether appellant intentionally shot the deceased and as to whether the shooting was in self defense. Carter v. State, 53 Ala. App. 248,298 So.2d 668 (1974); Barnes v. State, Ala.Cr.App., 361 So.2d 390, cert. den. 361 So.2d 396 (1978). There was no evidence presented to show that the victim was armed. It is apparent the jury could have found that appellant was not in imminent peril and could have retreated from the victim in safety. This is especially evidenced by appellant's own admission that he stopped to reload the shotgun before inflicting the second wound. The appellant's use of the shotgun, on two occasions, at two locations, presented evidence from which the jury could infer the appellant acted with malice. Harris v. State,48 Ala. App. 723, 267 So.2d 512 (1972).
Additionally, there was testimony that the victim had been shot "on purpose." The fact that appellant testified the first shot was accidental, and that the second shot was in self defense, presents a question for the jury. Carter, supra;Sashington v. State, 56 Ala. App. 698, 325 So.2d 205 (1975), cert. den. 295 Ala. 416, 325 So.2d 211 (1976). Even though the appellant's testimony in regard to self defense was uncontradicted, it was for the jury to determine appellant's credibility and accept or reject his testimony. Bufford v.State, Ala.Cr.App., 382 So.2d 1162, cert. den. Ala.,382 So.2d 1175 (1980); Washington v. State, Ala.Cr.App., 339 So.2d 611, cert. den. Ala., 339 So.2d 616 (1976); Cooley v. State,233 Ala. 407, 171 So. 725 (1937).
Finally, there was evidence, in the appellant's own statement, which indicates his family was threatened in regard to Rodney James' knowledge of a robbery. The jury could have inferred appellant shot James to prevent him from testifying, in response to the threat upon his family's safety.
The scope of appellate review is limited to a determination of whether there was substantial evidence presented to support all the elements of the crime charged. West v. State,57 Ala. App. 596, 329 So.2d 653, cert. den. 295 Ala. 427,329 So.2d 658 (1976). In the instant case the evidence was sufficient to sustain the ruling of the court and verdict of the jury.
 II.
Appellant contends the trial court erred in admitting into evidence hearsay statements of the victim, under the theory that they were "dying declarations." We note first that defense counsel tacitly recognized certain statements as dying declarations and indicated to the trial judge during the hearing on the motion to limit the evidence that he did not object to their admission. The record reflects the following:
 "MR. BOLT: I think it's important to get straight what I'm trying to accomplish here. It's not something improper or to keep the jury from hearing any proper *Page 798 
evidence. It's to establish what is determined proper evidence before the evidence has unfortunately been heard by the jury and then determined improper. The statements that are made by Rodney James to anybody I'm going on the assumption that it's the District Attorney's intention to try to offer to the jury the statements of Rodney James. If that's an incorrect assumption then we can stop here with an instruction that nobody repeat the statements. If it's a correct assumption that he's going to ask the witnesses to testify about what Mr. James had to say then I'm asking the Court to determine that admissibility of those statements before the statements are spoken in front of the jury. I'm sure the Court would admonish the jury to disregard it if it were improper. We all know that the human mind is only so strong. I don't think you can be capable of disregarding a man's dying declaration if you once heard it. That's why I'm asking for this means to determine if it's admissible in the first place. As I said if he's not going to put anything into evidence about what Mr. James said other than the fact that Mr. Lehr shot him — if that's the only statement of Mr. James that he intends to offer that `Dennis Lehr shot me' period.
 "MR. FIELD: `Who shot you? Dennis Lehr' is all he said.
 "MR. BOLT: And in no statements from any witness purporting to quote Mr. James about how it occurred. Why it occurred or if it was an accident or any of that then I don't have quarrels with that."
However, on appeal counsel argues that none of the statements made by the victim were dying declarations. He submits a proper predicate was not established by the State, and that certain of the victim's statements were inadmissible as opinions, rather than as statements of fact.
The first statement appears in the record as follows:
 "Q. At that time can you tell the Ladies and Gentlemen of the jury what his physical appearance was? How did he appear to be hurt?
 "A. He had bled real bad and was still bleeding some. He was rather white and rather weak I would say.
 "Q. Could you tell how many times he had been shot just by looking at him?
 "A. I would say two at least and he had a gash on his head that I thought could have been a shot.
 "MR. BOLT: Object. Move to strike. That's not responsive.
"THE COURT: Sustained.
 "Q. (By Mr. Field) Did the individual at any time make any statement to you as to who shot him?
"A. Yes, sir.
"Q. Who did he tell you shot him?
"A. Dennis Lehr.
 "Q. When you got him to Fuller's did you stay there until somebody else came or did you leave?
 "A. I stayed until Joe Fincher got there and took charge and was working with him and then the rescue squad came and picked him up and I asked Joe's permission to leave and I left."
This statement came in without objection from defense counsel, as he had indicated in the limitation hearing. However, during the testimony of a later witness, the following statement appears:
 "Q. Can you describe the physical condition of that individual when you first saw him out there?
 "A. He was sitting in a chair and semiconscious. He had two shots in him and in the arm.
 "Q. Did you perform — you have some training in medical aid or what do you call it?
"A. I'm a licensed EMT.
"Q. What's an EMT, medical technician?
"A. Yes.
 "Q. Did you perform any assistance to this individual at this time?
 "Q. Yes, sir. First thing I did was established an airway so he was breathing good. I then checked the bleeding and he was bleeding pretty bad. We stopped *Page 799 
that with four by four bandages. I took a blood pressure.
 "Q. All right. What was the blood pressure, do you remember?
"A. Around one fifty over eighty-five, I think.
 "Q. And during the course of the time you were examining the individual did you ask him any questions about who shot him?
 "A. Yes, I did. I first asked him if he had been drinking and he told —
 "MR. BOLT: Object. The witness is being unresponsive.
 "Q. During the time you were asking him questions did you at any time ask who shot him?
"A. Yes.
"Q. What, if anything, did he tell you?
"A. He said Lehr.
 "Q. All right. Did you later assist in getting this individual into an ambulance?
"A. Yes, sir.
 "Q. And I believe he was carried to Regional Medical Center.
"Q. Yes, sir."
. . . .
 "Q. (BY MR. FIELD) Mr. Fincher, did you ask Mr. James anything else regarding the circumstances of this shooting?
"A. Yes, sir.
"Q. Do you remember what it was that you asked him?
 "A. I asked him if he was shot accidentally or on purpose.
"Q. Do you remember what his reply was?
"A. On purpose."
It is the portion of the witness's testimony indicating that appellant shot the victim "on purpose" that appellant argues was inadmissible. He insists that it lacked a proper predicate and that it was an opinion or conclusion of the declarant.
First, we find a proper predicate had been laid for the admission of hearsay statements of the victim as dying declarations. The evidence as to the gravity and nature of the victim's wounds, blood pressure, loss of blood, state of consciousness, general physical condition, length of time before death occurred, and the surrounding circumstances, justify the trial court's conclusion that the victim had a consciousness of impending death. Young v. State, Ala.Cr.App.,363 So.2d 1007 (1978).
The circumstances of each individual case must be the guide in determining the existence of the victim's realization of his situation. The trial judge is in the best position to make such a determination and it is poor policy to disturb the ruling of the trial judge upon the interpretation of those circumstances.Marshall v. State, 219 Ala. 83, 121 So. 72 (1929). The trial judge held a thorough hearing on the matter outside the presence of the jury, at defense counsel's insistence, and heard sufficient evidence to determine that the victim was inextremis at the time the statements were made. Young, supra.
Additionally, we find that appellant waived any objection to the lack of a proper predicate indicating the victim's consciousness of impending death not only by failing to object to the admission of the first statement, but also stating in the limitation hearing that he had no objection to the introduction of such testimony.
The proper predicate having been laid, we are left with the question whether the statement by the victim that he was shot "on purpose" was objectionable as an opinion or conclusion of the declarant. We find the statement was properly admitted as a rendition of a collective fact by the declarant. Marshall, supra. That is to say, the phrase "on purpose" represents a collection of the facts as seen, heard, and known by the victim at the time he was shot. One in the extreme situation of the victim herein is not in the physical or mental condition to detail verbally the events leading to his predicament. Such a concise, limited verbalization of witnessed facts is to be expected, and respected from one in the victim's extreme condition. This short phrase was the victim's means of communicating quickly all that he observed surrounding the *Page 800 
shooting. It was not a surmise, guess, or hypothesis by the victim as to what occurred. Rather, it was a necessarily succinct statement of facts by one with obviously little time and physical ability to relate what he had observed. The statement was properly admitted as a statement of witnessed facts contained within a dying declaration.
 III.
On motion for new trial, appellant questioned for the first time the manner in which the master jury list for the trial jury venire was compiled. He asserts the jury commission failed to follow the statutory directions for the compilation of the master jury list and that such failure amounted to legal fraud.
Having raised this issue for the first time on motion for new trial, appellant has waived his right to object, unless he can show fraud or some irregularity which was not known, or by the exercise of due diligence, could not have been known before trial. Williams v. State, Ala., 342 So.2d 1328 (1977); Griffinv. State, Ala.Cr.App., 356 So.2d 723, cert. den. Ala.,356 So.2d 728 (1978).
Appellant and his attorney submitted affidavits stating that they were unaware of any problem with the master jury list until after the completion of the trial. Appellant presented substantial testimony on his motion for new trial from past and present jury commissioners, as well as introducing thousands of jury questionnaires into evidence. The trial judge thoroughly and painstakingly reviewed both the testimony and documents submitted on the motion and found no evidence of fraud.
The trial court found that there was no reason appellant, with the exercise of due diligence, could not have learned of any alleged irregularity prior to trial.
Under the facts presented, we hold that appellant has waived his right to object to the compilation of the master jury list. The initial burden of showing fraud in the compilation of the jury list rests with the appellant. There is a presumption that no legal fraud exists. Oyarzun v. Pittman, Ala.Cr.App.,367 So.2d 574 (1979).
Legal fraud requires that acts and omissions involving a breach of a legal duty injurious to others must be proved.Kittle v. State, Ala., 362 So.2d 1271 (1978). Additionally, the statutes concerning procedure for jury selection are not mandatory, and require only substantial compliance. Kittle, supra, Code of Alabama 1975, § 12-16-90. Even though there may have existed some irregularity by the jury commission in compiling the master jury list, we can find no evidence which proves legal fraud in the jury commission's actions. Smith v.State, 54 Ala. App. 561, 310 So.2d 484 (1975).
Further, the testimony and affidavits show beyond doubt that appellant could have found out, with due diligence, how the jury list was compiled prior to trial. Hence, in the absence of a showing of fraud, appellant has waived his right to object. See Brown v. Billy Marlar Chevrolet, Inc., Ala., 381 So.2d 191
(1980).
 IV.
Prior to the commencement of voir dire proceedings to empanel the jury, the victim's wife, Laura James, was seated with the district attorney at his counsel table. Appellant's counsel objected to the widow's presence on the grounds that it would inflame and prejudice the jury. The trial court overruled appellant's motion to remove her from the counsel table. Appellant also raised this issue in his motion for new trial.
The courts of this State have permitted relatives of the deceased to occupy seats in the courtroom during trial in close proximity to and in full view of the jury, against objection by defense counsel. Such a matter is purely within the sound discretion of the trial judge, and will not be disturbed on appeal in the absence of abuse of the trial court's discretion.Pollard v. State, 12 Ala. App. 82, 68 So. 494, reversed on other grounds, 193 Ala. 32, 69 So. 425 (1915). *Page 801 
It is not generally held to be an abuse of the trial judge's discretion to deny a new trial when the victim's immediate family have sat within the bar of the court, within view of the jury, and when they wept, sobbed aloud, or even fainted. Howardv. State, 273 Ala. 544, 142 So.2d 685 (1961). Certainly persons so related, just as other spectators at a public trial, may remain as long as they display no prejudicial conduct or behavior. Hall v. State, Ala.Cr.App., 377 So.2d 1123, cert. den. Ala., 377 So.2d 1123 (1979); McGuff v. State, 49 Ala. App. 88, 268 So.2d 868, cert. den. 289 Ala. 746, 268 So.2d 877
(1972); Kendrick v. State, 55 Ala. App. 683, 318 So.2d 378
(1975); Brodka v. State, 53 Ala. App. 125, 298 So.2d 55 (1974). Under the circumstances presented in the trial record for our review, we are of the opinion that the trial court did not abuse its discretion. The statements in this matter followingPollard, supra, reflect our thoughts and decision on this issue:
 "The court is charged with a high and important duty not without its difficulties in taking proper care to effect the object of, according to the accused, a fair and impartial trial while having due regard to interests of the state. No legal reason except that addressed to the court's discretion was assigned why the widow and children should have been excluded or removed to a different part of the courtroom, and we know of no rule of law that would authorize a court to exclude spectators or other persons from the courtroom, or remove them from the view of the jury, during the progress of a public trial of this nature, except for misconduct or some cause that appealed to the sound discretion of the court in administering substantial justice; and it is only an abuse of that discretion that this court can review. The record does not, to our mind, present such an abuse of discretion as would justify a court of review in reversing the judgment on account of the court's refusal to grant the defendant's request in this case." 12 Ala. App. at 90, 68 So. at 497.
 V.
Appellant contends that the trial court erred in refusing to give 46 of his 47 requested written charges. We note first that the trial judge gave a lengthy and comprehensive oral charge which substantially and fairly covered the same rules of law contained in the requested charges. Code of Alabama 1975, §12-16-13; Lambeth v. State, Ala., 380 So.2d 923 (1979); Dillardv. State, Ala., 371 So.2d 947 (1979).
Additionally, many of the refused charges were either ungrammatical, not properly predicated or hypothesized on the evidence in the case, or contained other defects which negated any potential error in their refusal. Barnes v. State, Ala.Cr.App., 361 So.2d 390, cert. den. Ala., 361 So.2d 396
(1978); Core v. State, 50 Ala. App. 533, 280 So.2d 794, cert. den. 291 Ala. 776, 280 So.2d 797 (1973); Thomas v. State,124 Ala. 48, 27 So. 315 (1899). We find no error in the trial judge's refusal to give the appellant's written charges.
We have reviewed the entire record and find no error prejudicial to the substantial rights of the appellant. Therefore, the judgment of conviction by the Calhoun Circuit Court is affirmed.
AFFIRMED.
All the Judges concur. *Page 1348