162 So. 314

## SAWYER et al. v. STATE.

1 Div. 199.

Court of Appeals of Alabama.
April 30, 1935.

Rehearing Denied May 14, 1935.

J. D. Ratcliffe, of Monroeville, for appellants.

A. A. Carmichael, Atty. Gen., and Jas. L. Screws, Asst. Atty. Gen., for the State.

BRICKEN, Presiding Judge.

The two appellants were jointly indicted, jointly tried, and both were convicted, and appeal from the judgment of conviction wherein both were adjudged guilty of the offense of murder in the second degree and duly sentenced to imprisonment for ten years. The indictment contained three counts originally, but before the case was submitted to the jury, the court, at the instance of the state, entered a nol pros as to the first count of the indictment.

Count 2 of the indictment charged the defendants with the offense of murder in the second degree. Specifically, that they "unlawfully and with malice aforethought killed Will Youngblood by striking him with their fists and feet, or, by striking him with some blunt instrument to the grand jury unknown, but without premeditation or deliberation." The third count charged them with killing the said Youngblood "by pushing or throwing him from the top of a high ditch or gully," etc.

Each count of the indictment designates defendant Lynum as, "J. W. Lynum, alias Pete Lynum, whose name is to the grand jury otherwise unknown."

Before pleading to the merits, the defendant Lynum interposed his plea of misnomer, which was stricken by the court upon written motion of the state. This plea in abatement of defendant Lynum was filed in time and we do not accord to insistences of counsel to the effect that the trial court granted the motion to strike on the grounds that it came too late. The ruling of the court in this connection as shown by the judgment entry is as follows: "Defendant, J. W. Lynum, alias Pete Lynum, filed his plea of misnomer, the State filed its written motion to strike said plea, and upon consideration thereof it is considered and adjudged by the court that said motion be, and hereby is, granted, and that said plea of misnomer be, and hereby is, stricken." The motion to strike the plea was based upon eight specific grounds, some of which, notably ground 7, was well taken, therefore the court's action in this connection must be sustained.

It will be noted the indictment in this case conforms to the provisions of section

4537 of the Code 1923, as to the name of defendant Lynum. It is therein provided: "The indictment must be certain as to the person charged; but when his name is unknown to the grand jury, it may be so alleged without further identification." The following authorities sustain the trial court's action in striking the plea. Axelrod v. State, 7 Ala. App. 61, 60 So. 959; Oliveri v. State, 13 Ala. App. 348, 69 So. 359, and cases cited; Glenn v. State (Ala. App.) 158 So. 198;[1] Hughes v. State, 22 Ala. App. 344, 115 So. 697. The cases cited by appellant's counsel, to wit, Benton v. State, 24 Ala. App. 441, 136 So. 428, and others, differ from the case at bar, in that the indictment in those cases did not contain the allegation, "whose name is to the grand jury otherwise unknown."

█ The evidence in this case was in sharp conflict, therefore a jury question; and the court properly refused to defendants the general affirmative charge which they requested in writing.

█ The attending physician, Dr. L. B. Farish, testified that Youngblood, the deceased named in the indictment, was brought to the hospital on Sunday afternoon and that he arrived there with a broken neck, and that meningitis, which was the result of his broken neck, caused his death. This witness also testified, "And there were a good many bruises in and about his face and forehead, * * * there was a pretty severe wound in his forehead. And there were some places on his back and hips that were bruises or scalds or bed sores." This witness, Dr. Farish, also testified that 'on the following Wednesday, before he died on Friday, "I advised him of the seriousness of his condition. He asked me if I did not think he was going to die, and he said, 'I realize I cannot get well.' He said, 'I realize I cannot get well and I think I should tell what really happened.' I told him I was glad he felt that way; that it relieved me of the responsibility of having to tell him he could not get well." This witness then proceeded without objection to relate the statement made at that time to him by Youngblood. The witness stating: "He first said: 'These boys that were with me.' He said Pete Lynum and the Sawyer boy. He said they asked him to get some whisky for them, and he told them he had no money, and he said one of the boys told

him, 'I know you have, because I saw a merchant pay you some money,' and he said he undertook to get away from them, and ran, and they overtook him and kicked him and hit him, and beat him, and drug him about 100 yards into a gully. I would not say that is the exact words he used, but that is substantially what he said."

The record shows that Youngblood, the injured party, also made a statement, apparently on the same day, to one B. H. Nall, a justice of the peace. Nall was introduced as a witness, and without objection testified as follows:

"My name is B. H. Nall. I am a Justice of the Peace, and live at Atmore. I was such an officer on December 20th, 1933. I did not know Mr. Youngblood. I was called to the hospital by Dr. Farish to take the statement of some one who he represented to be Mr. Youngblood. He was in the hospital at that time. He made a statement to me as to the cause of his injuries. * * * He did not make but one statement to me, and that was when Dr. Farish came and got me to go to the hospital. I took his statement down in writing.

"This is the statement he made. He said he was in his right mind and realized he must die, or thought he would die from the injuries he had, and that he wanted to make a statement. Realized was the real word he used. He said he left Frisco City about ten o'clock on Saturday night, and that the boys names were some Sawyer and Mr. Lynum. I remember Pete Lynum. He said they were Jay Sawyer and Pete Lynum.

"He said he didn't want to go after the whisky and tried to get away from them and go home and they caught him and drug him down or got him down, and stomped him and kicked him and threw him in the ditch. He mentioned Pete Lynum and Jay Sawyer. He seemed to be rational so far as I could tell.

"Dr. Farish and Mrs. Youngblood were present, and one or two daughters and a son, I think. We had some difficulty in understanding him. We had to listen pretty close. He was very weak, and seemed to be suffering considerably. He seemed to be rational. I had never seen him before."

State witness, Dr. W. S. Beard, was permitted to testify as to the dying declaration of Youngblood. The predicate to this

[1] Ante, p. 264.

witness was ample to justify the court in overruling defendant's objection to this witness being permitted to testify as to the declaration. Dr. Beard testified: "He told me those boys hurt him, Jay Sawyer and Pete Lynum. He told me he got with the boys or the boys got with him in Frisco City, and that they wanted to go and get some whisky, wanted him to go with them or wanted him to get the whisky and that he didn't want to go, and the best I recall it, he didn't have any money; and that they insisted that he go with them, and he said he told them that he wanted to go home, and they insisted, and they all started together from town, and they wanted them to go through by the school building, the way they were going that leads into those gullys, and that he insisted that they go straight down the road by the school building to where I live and the road turns to go to his place, and that he thought when he got there he could get away from the boys, and said when they got there he made an effort to run towards home, and that the boys caught him, and then he said he called me, and the boys began to carry him to the north which leads to the old by-road that goes into those gullys, and said they began to drag him over some ridges, and that they kicked him, stomped him, and knocked him and pushed him in the gully. * * * He knew me when I spoke to him at the hospital. He called me by name as usual."

The insistence of the state is to the effect that the offense complained of happened some time after 1 o'clock Saturday night. The evidence tends to sustain this insistence. The evidence also shows that very early on the following morning (Sunday) these two appellants were down in the gully or gravel pit with Youngblood who was seriously injured, and was finally taken from the gully by other parties, and later on that day carried to the hospital hereinabove referred to.

The two defendants insisted, and so testified, that the deceased on the night in question was in a drunken condition and fell over the edge of the embankment into the gully or gravel pit thus causing his death. The defendants also denied having assaulted the deceased or that they threw him or caused him to fall into the pit.

It was shown by the evidence that the gravel pit or gully "is 27 feet sloping and 19 feet straight up."

The rulings of the court upon the admission of evidence to which exceptions were reserved are so clearly free from error a detailed discussion of the elementary points of decision need not be had.

■ Refused charges 3 and 16 were fairly and substantially covered by "given" written charge 18, and also by the court's oral charge.

■■ On defendant's motion for a new trial it was insisted that "the verdict of the jury is void and wholly insufficient to sustain the judgment of conviction." The verdict reads: "We the jury, find the defendants guilty of murder in the second degree as charged in the indictment and affix the punishment at Ten (10) year imprisonment in the penetenay." There is no merit in this insistence. As was its duty, the jury ascertained the degree of homicide, and the following portion of their verdict, to wit, "We the jury find the defendants guilty of murder in the second degree as charged in the indictment and 'affix' the punishment at ten (10) year imprisonment" is of itself sufficient to support the judgment. The additional words "in the penetenay" were unauthorized and are mere surplusage, for, as stated, it was proper for the jury to ascertain not only the degree of homicide, but also to fix the term of their punishment. But it was not within its province to designate by its verdict the character of punishment or the place where the convicts should be confined. Smith v. State, 25 Ala. App. 405, 148 So. 858; Chappell v. State, 19 Ala. App. 648, 100 So. 75. As to the word "affix" instead of "fix," it is clearly a misprision or clerical error, and is self-corrective. There can be no doubt as to the intention of the jury in this connection notwithstanding the misspelling of the word. Webb v. State, 138 Ala. 53, 34 So. 1011; Johnson v. State, 19 Ala. App. 308, 97 So. 150.

■ After an attentive consideration of this record in its entirety, we are convinced the defendants were accorded a fair and impartial trial throughout and that no prejudicial error occurred during the trial. The evidence adduced was ample to support the verdict of the jury, if the evidence of the state was believed by them to be true, for, if true, it manifestly established the guilt of the defendants beyond the reasonable doubt which the law requires. It is apparent that the evidence of the defendants and some of their wit-

nesses is in direct conflict with the undisputed physical facts shown upon this trial. Finding no error in any of the court's rulings and none upon the record proper, it follows that the judgment of conviction from which this appeal was taken must be affirmed. It is so ordererd.

Affirmed.

