TYSON, Judge.
The appellant was indicted for the first degree murder of his former wife, Frances Coleman, “by cutting her with a knife.” The jury found the appellant guilty of murder in the first degree as charged and fixed punishment at life imprisonment. The trial court then set sentence in accordance with this verdict.
Alice Johnson testified that on June 29, 1975, she was living with her daughter, the deceased Frances Coleman, in Dothan, Alabama, at 304 East North Street. She stated that her daughter Frances had formerly been married to Joe Junior Douglas, the appellant, but they were divorced.
Mrs. Johnson stated that on the evening of June 29, she returned to her daughter’s home and found the appellant there sitting on the front porch talking to her daughter. Mrs. Johnson stated she was eighty-three years of age and had just been on a brief trip to Newton, Alabama. When she returned, she heard the appellant say to her daughter that, “he wanted her,” and that her daughter said she would see what she could do. She stated her daughter then said for him to call her the next evening. From the record:
“Q. What happened then, Mrs. Johnson?
“A. He wanted to go to the bathroom and asked if Frances let him go. And he went in the bathroom and he stayed a good while in there. And he came out and we was standing in the living room. He came out of the bathroom and he stood at the kitchen door, one hand on the side and went a peeping all in the kitchen. And when he come out, Frances was standing a little ahead of him. He throwed his left arm around her neck and he just put into cutting on her. And I said huh-hu and he just kept a cutting her and throwed her over in a chair. And I hollered don’t hurt her and I hollered help, help, help, help. Nobody didn’t come to me. And at that time, I thought about a blade I will just be truthful, I thought about a blade I carried in the house for her protection because I was there every day by myself.
“Q. Is that a lawn mower blade?
“A. That’s a lawn mower blade.
“Q. Where was this?
“A. Behind the chair. Not the chair Francis was in, the chair I usually sit in, and I reached back and got it and I hit him with it. And he cut Frances again and he turned around and caught me and said you bitch you, I will kill you. And I just thought it was my last too. I didn’t have no protection.
*882 “Q. Did you hear any shots at any time?
“A. I did. I heard two shots.
“Q. Where was Frances and Joe when you heard the shots ?
“A. Frances was in the chair.
“Q. By the air conditioner?
“A. Uh-huh. And Joe was cutting her.
“Q. All right.
“A. And I went, he throwed her over in the chair I was sitting in and that is when he grabbed me.
“Q. After he grabbed you and took the blade away from you, what did he do then?
“A. He went out the door, that was as far as I could see.
“Q. All right.
“A. I hollered and hollered and another man came and he got there to (sic) late. I hollered help, help, help and nobody ever come.
“Q. Did you see what happened to the gun?
“A. No, I didn’t see the gun. I just heard it shoot.”
Mrs. Johnson stated she called to her daughter to shoot again, but heard nothing further.
On cross-examination Mrs. Johnson said that her daughter went by the last name of Douglas at the time of her death and that she had been formerly married to Coleman and then married a second time. She stated that the instance in question happened shortly after 7:00 P.M. just before dark on the evening in question. She stated that in response to questions, she did not know where the pistol came from, that she did1 not see one in her daughter’s hands, or on the dresser or coffee table near where the appellant had thrown her daughter. She stated that she had only been back at the house ten or fifteen minutes when the fight started. She testified she saw the appellant cut her daughter with a knife.
Alexander Neal testified that on June 29, 1975, he lived at 306 East North Street in Dothan, that he heard some people “hollering” next door and that he went over to see what was happening-. He said he tried to help Mrs. Johnson and saw Frances sitting in a chair in a pool of blood. He said that he met the appellant coming out of the house and as the appellant ran past him, he exclaimed, “he was tired of these mothers and daughters running over him,” and that he used curse words. On cross-examination, he stated he could not tell whether Joe Douglas was hurt or not.
Danny McGriff testified he was a patrolman for the city of Dothan on June 29, 1975. Officer McGriff stated he went to 306 East North Street in response to a call and saw one Alexander Neal who identified himself as a next door neighbor. He observed the body of Frances Coleman in a chair, “slumped over with blood all over her.” He called for a detective and the coroner. He stated that Police Sgt. Larry Lynn was the first to arrive and that he assisted Lynn in taking photographs. He identified a photograph of the victim, Frances Coleman, as accurately representing the scene when he first arrived. He testified that Sgt. Lynn locked up the house after the investigation.
Sgt. Larry Lynn testified he was with the Criminal Investigation Unit of the Dothan Police Department on June 29, 1975. He stated that upon his arrival at 304 East North Street, he met Officer Danny McGriff and a next door neighbor named Alexander Neal. He testified that together with Officer McGriff, they checked the body of Frances Coleman for vital life signs and found none. He said he was present when an ambulance attendant also checked for vital signs and none were found.
*883 Sgt. Lynn described the living room of the house as being a “mess” and that blood was all on the walls, the floor, coffee table and on the couch, that there was some broken furniture, and that he found a lawn mower blade in the middle of the floor. He further testified that he locked up the premises after the body was removed and that two days later, he went back with Sgt. Robert Davis and made a search of the living room. At this point, they found “the point of a pocketknife” blade and turned this over to Criminalist Dale Carter of the Department of Toxicology. Sgt. Lynn further stated that on the evening of the homicide, Mrs. Alice Johnson had given him some clothing which was also turned over to the Department of Toxicology.
On July 3, 1975, Sgt. Lynn received information that the appellant was at 559 Hall Street in the city of Montgomery, Alabama, and at that time, accompanied by Sgt. Black, they arrested the appellant and made a search of his person.
Upon searching the appellant’s pant's pocket, a pocketknife was found and the tip of the blade was missing. He testified this pocketknife was turned over to Dale Carter of the Department of Toxicology. In response to questioning, Officer Lynn stated that he had been advised that subsequently a pistol was found in the living room of the home. On cross-examination he testified that at the time of the arrest, there were two small caliber gunshot wounds in the appellant’s back, “just above the belt line.”
Sgt. Robert Davis corroborated Sgt. Lynn’s testimony concerning the finding of the tip of the knife blade.
Dale Carter testified that he examined the small triangular shaped piece of metal which had been delivered to him by the Dothan police officers and also the pocketknife and found that the tip was from the same knife.
G. R. McCahan, Jr., testified that as State Toxicologist he performed an autopsy on one Frances Coleman at Southeast Alabama General Hospital on June 30, 1975, that Coroner Jack Still, Dr. James Buttram, and Dothan Police Officers Ronald Black and Sgt. Larry Lynn were both present. He said that he found extensive knife wounds on the body of the deceased, that several of these were deep stab wounds in the area of the throat, chest and jaw, that some of these were two to three inches in depth; that on the left side of the throat, there were eight slices and on the right side of the throat, four slices; and that the right carotid had been severed; that on the left side the common carotid artery was severed once and almost severed a second time. There were numerous stab wounds about the face and body of the victim. He testified that the cause of death was the “severing of the carotid arteries in the neck.”
Dr. McCahan testified he had also received a pocketknife and a piece of metal tip which he had turned over to Mr. Carter of his laboratory for examination. He further testified he had received one bullet which was identified as being removed from the body of Joe Junior Douglas, a pair of blue trousers belonging to Douglas, and a .22 caliber Rohm pistol, Serial No. 1191252, together with four live rounds and two spent cartridge cases.
Charles Brooks testified he was employed by the Department of Toxicology in Enterprise, Alabama, on June 29, 1975. He testified that from Mr. Dale Carter of the Department he received a lawn mower blade and pocketknife with broken tip, that he delivered these to Mr. William H. Lan-drum.
Mr. Landrum testified that he received a lawn mower blade, pocketknife and knife tip and made an investigation for the presence of blood; that he had also received from Dr. McCahan a sample of blood identified as being from the person of Frances Coleman. Mr. Landrum testified that the victim’s blood was group B, MN, and that *884 he found the presence of this type blood on the knife.
The appellant’s motion to exclude for failure to make out a prima facie case was overruled.
The Defendant called one Earl C. Jones. He testified on July 7, 1975, he received some keys to the home of Frances Coleman, who was his mother-in-law, from Officer Larry Lynn. He stated he was cleaning the house and that he found a .22 caliber small pistol which had been covered by a small bedroom shoe and that he turned these items over to Sgt. Lynn that day. He testified that a vase of flowers had been knocked over and was lying in the same area where he found the pistol.
At this point, the State and the defendant stipulated as to a .22 caliber bullet which had been removed from the person of the appellant, Joe Junior Douglas, by Dr. McClintock.
Sgt. Larry Lynn was then recalled and testified that he turned over the pistol which he received from Earl Jones, and the bullet which he received from Dr. Mc-Clintock, to Criminalist Dale Carter.
Dr. McCahan was then recalled and testified that he received the pistol and bullet from Officer Lynn and turned them over for examination to Dale Carter. Dale Carter was then recalled and testified he made a test comparison of the bullet removed from Joe Douglas with test firings from the .22 pistol and said that the bullet in question was fired from a pistol with the same identical class characteristics but that he could not positively state that the bullet was from the pistol, but that “it could have been fired in that pistol.”
Joe Junior Douglas then testified that he had gone to the home of Frances Coleman on the afternoon of June 29, 1975, after receiving a telephone call from his ex-wife; that she had called him about 6:00 that evening. He testified that the deceased had “a warrant sworn out” for “breach of peace.’’ He said that he went over to give her $30.00 to pick up the warrant and that he gave her $50.00 more. He stated that she wanted him to open up a bank account and put money in it in her name and that he had helped her pay some bills. He said he did not want to come over without her consent and that later while they were talking, the deceased’s mother came home, and they began to argue. From the record:
“ . . . And she said well, I am just tired of you fooling with me and I don’t see why you worry me. And her mama was sitting right there in the chair, with her hand down to her side. And, I didn’t see nothing at that time. And her mother was sitting there in the chair with her arm hanging down beside her and I said Frances, I did not come over heré to harm you. I said I wouldn’t be here if you didn’t invite me here. And I said within myself, god dog, I done walked in a trap. I said no telling who is here to kill me. I said well, I’m going and I will call you sometime tomorrow. And she said no, don’t go. When I was right there at the door, her mama hollered said shoot him. And a bullet hit me in the back. And she said shoot him again. And a bullet hit me in the back. And she said shoot him again. And a bullet hit me in the back and I went to my knees. Well, when I went to my knees, and I turned around on my knee on one knee and one foot, her mother had the lawn mower blade coming down. First, I got caught on my arm. And the next lick that she went to come down on me, I caught that on my shoulder over here on this shoulder, right here when I had made a turn. And, I took my feet and placed it in her stomach and kicked her over to the side of the wall. Well, at that time the pistol in Frances hand snapped again. Well, when the pistol snapped again, I will admit that I run my hand in my pocket but I didn’t do that with no intention of doing nothing to her, just trying to analyze, I mean *885 smooth things out. I reached my hand in my pocket and I pulled my knife out and went to sticking on her hand. And, she was still hitting on me with the pistol. And I went to getting blood in all of my eyes and I couldn’t see. What this doctor say about all this unnecessary cutting, I don’t remember doing all that cutting. And, I got one hundred and fifty dollars in my pocket to prove to them Jury and not charge to the County, I take a lie test to prove that I am telling the truth. And I am paying for the lie test. And I will pay for the lie test that her mother invited me there.”
The appellant further testified he was operated on and had one bullet removed from his back and that he had had to have an additional operation and that one of the bullets was near his spine and could not be removed. On cross-examination appellant admitted a 1948 grand larceny conviction, a murder in the second degree conviction in March 1950, and a first degree murder conviction in July 1952.
I
Appellant first asserts that the trial court erroneously admitted into evidence the “gruesome photographs of the victim.” We have carefully examined these photographs and they graphically depict the testimony of Mrs. Johnson and Officer Danny McGriff immediately after the homicide. We are of the opinion that these photographs were properly received in evidence. Smarr v. State, 260 Ala. 30, 68 So.2d 6; Nichols v. State, 267 Ala. 217, 100 So.2d 750; Brodka v. State, 53 Ala.App. 125, 298 So.2d 55.
II
Appellant also asserts that there was a fatal variance between the indictment and the testimony at trial since the appellant’s mother referred to her as Frances Douglas. The indictment in question refers to the deceased as “Frances Coleman, whose name is to the Grand Jury otherwise unknown.” Further, Mrs. Johnson testified that her daughter had remarried after her divorce from the appellant. Also the neighbor stated he knew the deceased as “Frances Coleman.”
We are of the opinion that no fatal variance is here shown. Ward v. State, 242 Ala. 307, 6 So.2d 394; Clark v. State, 21 Ala.App. 597, 110 So. 562; Sawyer v. State, 26 Ala.App. 434, 162 So. 314.
Beyond question, the State of Alabama presented a prima facie case and after careful examination, we find the record free of error. We are of the opinion appellant received a fair and impartial trial, and the judgment is therefore to be and the same is hereby
AFFIRMED.
HARRIS, DeCARLO and BOOKOUT, JJ., concur.