The appellant was indicted for the murder of Phillip Walker by shooting him "with a gun." The jury found the appellant guilty of murder in the first degree and fixed punishment at life imprisonment. Thereafter, the trial judge set sentence accordingly.
The appellant filed three pretrial motions: (1) Motion to produce exculpatory evidence; (2) Motion for investigation of the sanity of the defendant; (3) Motion to suppress illegal evidence. In response to the first motion, the trial judge requested the prosecuting attorney to produce any evidence in his possession or any information that he was aware of that was exculpatory in nature. The trial judge ultimately denied the motion when the prosecuting attorney stated that he was unable to make a determination of what was exculpatory until he knew the defense to be used in the case.
The trial judge granted the motion to investigate the sanity of the defendant. Accordingly, the appellant was examined by the East Alabama Mental Health Center.
The appellant's request for a hearing on the motion to suppress illegal evidence was granted. The proceedings began with a hearing conducted out of the presence of the jury to determine whether certain evidence seized during the investigation would be admitted at trial or suppressed pursuant to defense counsel's motion.
Auburn Police Detective Edwin D. Downing testified that on August 19, 1977, he participated in the investigation of the shooting death of Phillip Walker during the course of his employment with the Auburn Police Department. On this date, Detective Downing interviewed the appellant shortly after he had been taken into custody. Prior to obtaining a statement from the appellant, Detective Downing read to him from a standardized card his Miranda rights. Detective Downing stated that he knew the appellant could not read or write. Detective Downing explained to the appellant the meaning of a waiver form following which the appellant made his mark on the waiver form. In addition to Detective Downing, Detective Donovan witnessed the appellant's "signature or mark" (R. p. 21). The appellant then proceeded to relate to the police the events surrounding the shooting of Phillip Walker. The appellant's words were transcribed as he spoke by Detective Downing. After he finished dictating his statement, the appellant heard the statement read back to him before he made his mark on it. The statement of the appellant taken on August 19, 1977, was marked State's Exhibit Two for identification purposes.
Detective Downing testified that on August 22, 1977, while the appellant was in custody, he made another statement to the police, again transcribed by Detective Downing. Prior to making the statement, the appellant was informed of his Miranda
rights, which he waived. Detective Downing stated that no force, threats, promises, or other inducements were made or offered to the appellant in order to get him to make a statement. The statement taken on August 22, 1977, was marked State's Exhibit Four for identification purposes. The trial judge withheld ruling on the admissibility of State's Exhibits Two and Four until the defense had presented evidence in support of its motion to suppress.
On cross-examination, during the suppression hearing, Detective Downing testified that the appellant did not request to consult a lawyer while he was in custody. The witness could not recall whether the appellant had requested to see members of his family, nor did he recall whether the appellant had requested medication for his blood pressure condition. Detective Downing testified that he informed the appellant that he was charged with murder at the time that he waived hisMiranda rights although the waiver form itself (State's Exhibit One) was blank where the offense charged would have been noted in writing. The waiver form used in connection with the statement made on August 22, 1977, State's Exhibit Three, properly showed the charge of first degree murder against the appellant. *Page 1306 
The interview with the appellant on August 19, 1977, began at 7:45 p.m., approximately two hours after the appellant's arrest. The second interview with the appellant on August 22 began at 9:50 p.m. and concluded at 1:15 a.m. on August 23. As a direct result of the second interview, the police located the barrel of a sawed-off shotgun which the appellant confessed was the murder weapon.
The appellant was called to the stand at the pretrial suppression hearing for the purpose of testifying as to the voluntariness of the alleged confession. The appellant testified that, after his arrest, the police took him to the police station and questioned him. The officers, Detective Downing, Detective Donovan, and Officer deGraffenried, read hisMiranda rights to him, but, according to the appellant, they did not read the statement back to him after it was transcribed and before he made his mark on it. The appellant acknowledged the "X" marks on State's Exhibits One through Four as being his "X" marks.
The appellant recalled that the officers who questioned him would not allow him to consult a lawyer or to see members of his family. According to the appellant, he was not informed of the charge against him prior to the interview on August 19. The appellant stated that, after the same interview, he requested his medication for his blood pressure condition. The medication arrived the next day, August 20.
Julian Woodhouse, Director of Screening, Evaluation, and Court Services for the East Alabama Mental Health Center, testified that he examined the appellant on October 5 and 6, 1977, at the Lee County Jail. Mr. Woodhouse, a psychologist, was shown to possess the necessary qualifications to express his opinion as to human intelligence, psychological development, and emotional stability, based on his interpretation of empirical data collected through evaluative testing. Mr. Woodhouse concluded that the appellant's verbal intelligence quotient was approximately 58. The witness explained that this figure was within the range of mild mental retardation. Mr. Woodhouse's written report continued (R. p. 505):
 ". . . The client [appellant] is unable to read or write, cannot recite the alphabet or count to twenty, and cannot tell time. He has no useful arithmetic skills, cannot understand abstract concepts, and has limited practical skills. . . ."
Mr. Woodhouse stated that the appellant would have difficulty understanding the meaning of a standard Miranda waiver form without having it explained to him in substantial detail.
On cross-examination, Mr. Woodhouse's written report was admitted as State's Exhibit Five for the limited purpose of determining whether the statements given by the appellant were voluntarily made. The witness' report stated in conclusion (R. p. 505):
 "Based on interview and test data, Mr. Jones is not psychotic at the present time. His reality orientation and reasoning processes are basically intact, and he gives evidence of having a rational and factual understanding of the charges against him. He is presently able to give an account of his thoughts, feelings, and actions at the time of the alleged offense. He is also aware of the possible consequences of being found guilty of the alleged offense and is motivated to defend himself against the charges made against him. In his present condition he may reasonably be expected to assist and cooperate in his defense.
 "Based on interview and test data, Mr. Jones, in the examiner's opinion knew the nature and harmfulness of shooting the victim and gives evidence that he was aware that his behavior would be severely condemned and considered `wrong' by the community. At the time of the evaluation he gave no evidence of having been subject to defective perception, delusions, or other forms of thinking so disordered as to have grossly interfered with his ability to correctly perceive and evaluate the objective reality of his circumstances and behavior at the time of the alleged crime." *Page 1307 
At the conclusion of Mr. Woodhouse's testimony, no further evidence related to the voluntariness of the statements having been offered, the trial judge ruled State's Exhibits One through Five admissible (R. p. 89). Thereafter, the trial judge ordered the jury back into the courtroom and the trial began.
Edward James Cobb testified that, on August 19, 1977, he and Phillip Walker, the deceased, went to the home of Dorothy Mae Thomas. Mr. Cobb and the deceased customarily drove to and from work together. On the day in question, Mr. Cobb drove the deceased to Ms. Thomas' home after work so that the deceased could pay Ms. Thomas for the meals she cooked for him. Ms. Thomas was not home so the two men drove to the home of Ms. Thomas' mother, at 644 North Gay Street, hoping to find her there. Mr. Cobb parked in front of the house on the street, approximately twenty feet from the front porch. The deceased got out of the automobile and went into the house. Mr. Cobb waited in his automobile. A short time later, Mr. Cobb recalled that Clarence Vinson and the appellant arrived and parked in front of his automobile. The driver, Clarence Vinson, got out of the automobile and went into Ms. Thomas' home, the same house the deceased had earlier entered. Then the appellant exited the passenger side of Vinson's automobile, walked to Mr. Cobb's automobile and asked where the deceased could be found (R. p. 104). Mr. Cobb told the appellant that the deceased was inside the house. The appellant then turned and walked toward the house. Mr. Cobb noticed that the appellant carried a sawed-off shotgun in his belt (R. p. 110).
As the appellant reached the front porch of the house, the deceased was coming out of the front door. At this point, the appellant and the deceased were approximately three feet apart. According to Mr. Cobb, when the two men met, the appellant pushed the deceased back through the doorway. The appellant continued to shove the deceased into the doorway. Mr. Cobb could not hear what the appellant was saying to the deceased during this time. After the second shove, the appellant drew his gun and shot the deceased once in the abdomen. The two men were approximately a foot apart when the shot was fired.
After the shot, the deceased fell to the floor inside the doorway of the house. The appellant ran from the house into the front yard, paused to eject the shell from his weapon, looked in Mr. Cobb's direction and ran down the street away from the scene. Mr. Cobb told someone to call the police as he watched the appellant get into an automobile some distance down the street. The witness recognized the driver of the automobile as being Odessa Hill.
Clarence Vinson testified that he saw the appellant, his brother-in-law, on August 19, 1977, about 2:00 p.m. Mr. Vinson drove to the liquor store to buy some gin, which he shared with the appellant upon returning. After consuming the pint of gin, the two men drove in Mr. Vinson's automobile to a bar where they hoped to drink on credit. When no credit was forthcoming, Mr. Vinson recalled that Phillip Walker, the deceased, owed him two dollars. Mr. Vinson found the deceased at Ms. Thomas' home. The deceased told Vinson that he would pay him later. Shortly after Mr. Vinson had talked with the deceased, the fatal affray occurred at the front door of the house. Mr. Vinson did not see the shooting, nor did he hear any conversation before the shooting because, at the time of the shooting, he was in the back of the house talking with his wife. When he heard the shot, Mr. Vinson looked into the front room and saw the deceased lying on the floor just inside the front door. Mr. Vinson did not see the appellant after the shooting, nor did he see a gun or a knife near the deceased as he lay on the floor. Mr. Vinson testified that he had given the appellant the sawed-off shotgun used in the shooting about two or three months earlier.
Julia Mae Thomas testified that she lived in the house at 644 North Gay in Auburn where the deceased was shot. Ms. Thomas recalled that on the afternoon in question, Phillip Walker came to her house, looking *Page 1308 
for her daughter, Dorothy Mae Thomas. When Ms. Thomas told the deceased that her daughter was not home, the deceased walked out the front door of the house. Ms. Thomas heard a shot and then saw the deceased fall back into the house. The deceased cried for help as he fell to the floor. From her vantage point in the back of the house, Ms. Thomas could not see who shot the deceased. Ms. Thomas stated that, prior to the shooting, she did not see the deceased with a knife or a gun in his hand (R. p. 182).
Elizabeth Askew testified that she lived at 644 North Gay Street and was present at that address at the time of the shooting. Ms. Askew went into the front room and saw the deceased fall to the floor. Ms. Askew did not see who shot the deceased. Ms. Askew recalled that she did not see a knife or gun in the deceased's hand, or on the floor near the deceased.
After the shooting, Ms. Askew called the police from a telephone located in another room of the house. Ms. Askew noted that no one touched or moved the deceased prior to the arrival of the police.
Dorothy Mae Thomas, a daughter of Julia Mae Thomas, testified that she had been to the doctor on the afternoon in question. Upon returning to her mother's house where she lived, Miss Thomas saw the appellant in front of her mother's house as he ran from the scene. At this point the appellant had a sawed-off shotgun in his hand. According to Miss Thomas, as the appellant ran past her, he said, "I meant to kill the damn son of a bitch" (R. p. 205). Miss Thomas did not see a knife or gun in the deceased's hand or near him on the floor.
On cross-examination, Miss Thomas admitted that she had been seeing the deceased socially for about a year prior to his death. Miss Thomas said that the deceased usually paid her twenty or twenty-five dollars each week for cooking meals for the deceased.
Odessa Hill testified that she was driving past Ms. Thomas' house on the afternoon in question. Ms. Hill saw the appellant some distance from Ms. Thomas' house. As she drove slowly past him, the appellant asked Ms. Hill for a ride to his home. Ms. Hill stopped, and after he got into the car, the appellant told Ms. Hill that he shot Phillip Walker. Ms. Hill drove the appellant home and told him to stay there. On cross-examination, Ms. Hill recalled that the appellant told her that he shot Walker because Walker had attempted to stab him.
John R. McDuffie, an employee of the Alabama Department of Toxicology and Criminal Investigation, testified that, on August 23, 1977, during the course of his employment, he received from Detective Ed Downing four sealed plastic bags. The bags contained a live shotgun shell, a spent shotgun shell, and the two halves of a sawed-off shotgun. These bags were assigned a case number and delivered by Mr. McDuffie to Mr. Tellis D. Hudson, a criminalist at the Department of Toxicology. Mr. McDuffie stated that the bags were in the same condition when delivered to Mr. Hudson as when he received them from Detective Downing. Mr. McDuffie recalled that the bags were in his possession for about ten minutes.
Daniel M. Avery, a pathologist with the Department of Toxicology, testified that he performed the post mortem examination on the body of the deceased, Phillip Walker, on August 23, 1977. Mr. Avery was shown to possess the necessary qualifications to express his opinion as to the effect of injuries upon the human body. Toxicologist Van V. Pruitt assisted Mr. Avery in his examination.
Based on his examination of the body and his training and experience as a pathologist, Mr. Avery's opinion was that the cause of the deceased's death was massive hemorrhage, resulting from severe destruction of the liver and the right renal artery by virtue of a shotgun wound to the abdomen. Mr. Avery testified that he gave the pocketknife, found in the deceased's right front pocket, to Coroner Norred.
Tellis D. Hudson, a criminalist with the Department of Toxicology, testified that he *Page 1309 
received evidence from two sources in connection with his investigation of the death of Phillip Walker. Mr. Hudson received from Mr. Avery several shotgun pellets, some wadding, and a bag of clothing worn by the deceased. These items were in the same condition at trial as when Mr. Hudson received them from Mr. Avery on August 23, 1977. The trial judge admitted these items into evidence over the specific objection of the defense to the introduction of the bloody shirt. The shirt was admitted into evidence after the State adduced testimony from Mr. Hudson, which showed that he had measured the powder residues found around the hole in the shirt in order to estimate the approximate distance between the deceased and the barrel of the shotgun.
Mr. Hudson received from Mr. McDuffie four bags containing a live shotgun shell, a spent shotgun shell, and the two halves of a sawed-off twelve gauge shotgun. These items were in the same condition at trial as when Mr. Hudson received them from Mr. McDuffie on August 23, 1977. Both shotgun shells were admitted without objection. The shotgun itself was admitted over defense counsel's objection, which the trial judge had earlier overruled in the suppression hearing. Based upon a comparison of test-fired shells with the spent shell in evidence, Mr. Hudson concluded that the sawed-off shotgun in evidence could have fired the evidence shell. Mr. Hudson could not be certain because the particular shotgun in evidence did not reproduce characteristic breach block markings on every shell fired in the shotgun.
Captain John Lockhart of the Auburn Police Department, testified that, on August 19, 1977, at 4:58 p.m., in response to a police radio broadcast, he went to 644 North Gay Street in Auburn to investigate a possible shooting. Upon arrival, Captain Lockhart observed a male lying in the floor of the front room of the house. Captain Lockhart learned from the females at the scene that the man had been shot and that the assailant was no longer present. Captain Lockhart radioed for assistance, secured the scene, and checked the victim for vital signs. Captain Lockhart recalled that the man was still alive at that point. Captain Lockhart found the victim's wallet in his left rear pocket, and identified him as Phillip Walker. Captain Lockhart remained with the victim until Coroner Norred arrived. Captain Lockhart testified that he did not see any weapons in the room where the deceased lay.
Coroner Norred testified that, on August 19, 1977, at 5:11 p.m., he arrived at 644 North Gay in Auburn to investigate a shooting in his capacity as Deputy Coroner of Lee County. Coroner Norred checked the victim for vital signs and found none. Phillip Walker was pronounced dead. Coroner Norred did not find any weapons in the deceased's hands.
Coroner Norred testified that the knife given to him by Mr. Avery, along with other personal belongings of the deceased, was turned over to the deceased's sister, Bessie Kershaw. In response to questioning, Coroner Norred described the knife as being a pocketknife approximately three inches in length when folded. Coroner Norred stated that it was customary to return the deceased's personal effects to the surviving relatives.
Officer Richard Jenkins, a patrolman in the Auburn Police Department, testified that, on August 19, 1977, at approximately 5:00 p.m., he went to investigate a shooting at 644 North Gay Street. Pursuant to information he received at the scene of the shooting, Officer Jenkins went to the East Park Apartments to find the appellant. Officer Jenkins went to the front door of one of the apartments at East Park while Officers Ingram, Jackson, and deGraffenried watched the exit from the rear of the apartment. Officer Jenkins could see the appellant through the screen door when he knocked. Officer Jenkins asked the appellant where he had been. "Nowhere" was the response received (R. p. 297). Outside, on the front porch, the appellant said, "I didn't shoot that man. Somebody behind me shot him" (R. p. 297). Officer Jenkins then requested the appellant to accompany him to the Police Station for further *Page 1310 
questioning. The appellant proceeded voluntarily making it unnecessary to place him under arrest. At the Police Station, Officer Jenkins delivered the appellant to Detective Plant.
Officer Bartholemew Ingram, Jr., a patrolman in the Auburn Police Department, testified to substantially the same events leading up to the apprehension of the appellant on the afternoon in question. After Officer Jenkins left with the appellant, Officer Ingram obtained permission to search the apartment from the tenant in possession, Ms. Sally Pearl Macon. Ms. Macon voluntarily and intelligently executed a written form, giving consent to the police to conduct a search. The form used was identified by Officer Ingram and admitted into evidence. During the course of the search of Ms. Macon's apartment where the appellant had been previously apprehended, Officer Ingram found the receiver end of a shotgun. Officer Ingram identified State's Exhibit Ten as the same instrument he found at Ms. Macon's apartment. Officer Ingram stated that the receiver of the shotgun was in the same condition when he turned it over to Detective Plant later that day as it was when he found it at Ms. Macon's apartment.
Detective Ray Plant, assigned to the Vice and Narcotic Division of the Auburn Police Department, testified that on the afternoon in question he received from Officer Ingram the receiver end of a shotgun. Detective Plant identified State's Exhibit Ten as the same item he received from Officer Ingram. State's Exhibit Ten remained in Detective Plant's exclusive possession for about ten minutes after which time he gave said exhibit to Detective Downing.
Officer Frank M. deGraffenried, IV, a patrolman in the Auburn Police Department, testified that he was assigned as duty officer on the night of August 19, 1977. Officer deGraffenried explained that the duty officer functions generally as a jailer. Officer deGraffenried first saw the appellant on the night in question when he searched him prior to admitting him to a jail cell. The search yielded a wallet, a plastic bottle of pills, a small pocketknife, and a live twelve-gauge shotgun shell. Officer deGraffenried put these items in an envelope, marked as appellant's personal possessions, and turned it over to Detective Downing. Later, Officer deGraffenried locked the appellant's possessions in the evidence locker in the property room of the Police Station.
Detective Edwin D. Downing was recalled to the stand to identify several photographs taken by him of the deceased and the surroundings at the scene on the afternoon in question. Each photograph was admitted over objection. Detective Downing identified State's Exhibit Ten as being the receiver of a shotgun that he received from Detective Plant on the afternoon in question. Detective Downing identified State's Exhibit Eleven as being the barrel end of a shotgun that fit together with State's Exhibit Ten. Detective Downing testified over objection that the appellant showed Detective Donovan and him where to find the barrel in some tall grass behind the East Park Apartments on the night of August 22, 1977. Detective Downing placed the barrel in a bag, initialed the bag, and delivered it to John McDuffie at the Department of Toxicology on the next day.
At the close of Detective Downing's testimony, the State rested its case. Outside the presence of the jury, the defense moved to exclude the State's evidence. The trial judge denied the motion, whereupon the case for the defense commenced.
Defense counsel related to the jury the stipulation of the parties concerning the authenticity of a receipt, subsequently admitted into evidence as Defendant's Exhibit One, given by Bessie Kershaw to Coroner Norred for the personal effects of the deceased.
The appellant testified that on the morning of August 19, 1977, his boss did not pick him up for work. The appellant drove Ms. Sally Pearl Macon to his sister's house, the home of Clarence Vinson. Then the appellant went to Opelika to look at some clothes. From there the appellant drove to Draketown to see Ms. Julia Mae Thomas. *Page 1311 
About noon, the appellant arrived back at the East Park Apartments where Ms. Macon lived. Clarence Vinson found the appellant at that location, and the two men agreed to contribute toward the purchase and consumption of a pint bottle of gin. According to the appellant, Vinson suggested later that they go to Julia Mae Thomas' house for a beer. When they arrived, Vinson got out of the driver's side of the car and went into the house. When the appellant got out of the car, he could hear loud voices inside the house. As he walked to the front porch of Ms. Thomas' house, he met the deceased coming out of the front door. According to the appellant, the two men bumped each other. The appellant stated that the deceased appeared angry. The appellant said, "Excuse me" (R. p. 365). "Damn, son of a bitch, you going to knock me down," was the reply from the deceased (R. p. 365). According to the appellant, the deceased reached into his pocket and approached him in a threatening posture. The appellant warned the deceased to get back but he persisted despite the warning. The deceased backed the appellant into a position against the wall between two pieces of furniture in such a way that the appellant had no available avenue of retreat. The appellant recalled that he was extremely "scared" of the deceased. The appellant recounted the conclusion of the affray as follows (R. p. 369):
 "A. And so I kept telling him to stop, stop and he wouldn't stop and so I just hauled off and just shot him and then I run out the door."
The appellant admitted using a sawed-off twelve-gauge shotgun to shoot the deceased. The appellant stated that he had taken the shotgun from Vinson earlier that day "to carry it home and put it up" (R. p. 366). After the shooting, the appellant was picked up by Odessa Hill and driven to the East Park Apartments where he hid the barrel of the shotgun before being arrested by the Auburn police.
On cross-examination, the appellant stated that he had no reason to kill the deceased other than to protect himself.
Julian Woodhouse testified at trial for the defense to substantially the same facts and conclusions as those to which he had previously testified at the pretrial suppression hearing.
Jessie Mae Jones, who lived with Clarence Vinson, testified that she was the appellant's sister. Ms. Jones stated that the appellant's reputation for truth and peacefulness in the community prior to the shooting was good. With respect to the deceased, Ms. Jones noted that his reputation for violence in the community prior to the shooting was bad. Ms. Jones testified further that the deceased was known to carry a knife concealed on his person. Ms. Jones confirmed that she was in a back room of Julia Mae Thomas' house, talking to Clarence Vinson at the time of the shooting.
Nell Rothwein, records custodian in the Auburn Police Department, testified that, according to the arrest records regularly kept by the police, Phillip Walker had been arrested on two occasions for carrying a concealed weapon and for public drunkenness. The arrest records were admitted into evidence by the trial court over the State's objection.
Sally Pearl Macon testified that the appellant was the father of their two children. Ms. Macon testified that, during the nine years of their relationship, the appellant's reputation for peacefulness in the community was good. The defense presented the testimony of two additional witnesses, which substantially corroborated Ms. Macon's testimony as to the appellant's general reputation for peacefulness in the community. At the close of this testimony, the defense rested, the trial judge delivered the oral charge, and the case was allowed to go to the jury, notwithstanding a request for the affirmative charge by the defense.
 I
The appellant argues on this appeal that he was denied his right to Due Process of Law, as guaranteed to him under the Fifth and Fourteenth Amendments to the United States Constitution when the *Page 1312 
prosecutor failed to produce at trial certain evidence claimed to be exculpatory in character. Specifically, the appellant asserts that the omitted evidence, a pocketknife found in the deceased's pocket, creates a reasonable doubt as to the appellant's guilt that did not otherwise exist. The prosecutor's failure to produce, therefore, allegedly denied the appellant a fair trial.
The appellant cites this Court to United States v. Agurs,427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), as support for his prayer for a new trial. In that case, the respondent was convicted of second degree murder, notwithstanding his plea of self-defense. In her motion for new trial, the respondent asserted that she had discovered that the deceased had a prior criminal record (including guilty pleas to charges of assault and carrying a deadly weapon, apparently a knife) that would have tended to support the argument that respondent acted in self-defense, and that the prosecutor had failed to disclose this information to the defense. In upholding the trial court's denial of respondent's motion, the United States Supreme Court, per Mr. Justice Stevens, discussed the prosecutor's constitutional duty to disclose exculpatory evidence to the defense. In determining whether nondisclosure results in constitutional error, the Court noted that the character of the nondisclosed evidence, not the intent of the prosecutor, is the controlling factor. If the nondisclosed evidence meets the Court's standard of constitutional materiality, a new trial is mandated.
 "The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." United States v. Agurs, supra, at 112-113, 96 S.Ct. at 2401.
In the case at bar, the evidence that the prosecutor failed to produce at trial, a pocketknife found in the deceased's pocket, falls far short of the standard of constitutional materiality laid down in Agurs, supra. Although the jury did not have the knife itself during its deliberations, testimony of Coroner Norred vividly described the size and appearance of the knife. Coroner Norred, exhibited his own pocketknife to the jury, explaining how that of the deceased was comparable. It is hardly convincing to argue on appeal that the mere presence of the pocketknife itself in the jury's deliberations would have created a reasonable doubt when such a vivid description of a commonly understood object did not. This is not a case in which the existence of exculpatory evidence was kept from the jury. Compare Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194,10 L.Ed.2d 215 (1963). The record in this case reveals that the prosecutor intended to introduce the pocketknife into evidence, but learned at trial for the first time that it had been routinely returned to the deceased's sister, along with other personal effects. The coroner's descriptive testimony was then tendered as a substitute for the presence of the pocketknife, the existence of which was stipulated by the parties. It appears, therefore, that, in the context of the entire record, no error resulted from the prosecutor's inability to produce the deceased's pocketknife. See Giddens v. State, Ala.Cr.App.,333 So.2d 615 (1976); Cannon v. State, 53 Ala. App. 509,301 So.2d 272 (1974). Moreover, a subpoena was issued at trial for the sister and for the pocketknife, but she could not be found.
A close examination of the record in this case reveals not only that the claim with regard to the pocketknife lacks merit, but also that the procedural aspects of the issue are flawed. Appellant filed a timely motion for new trial on November 9, 1977 (R. *Page 1313 
p. 494). This motion made no mention whatsoever of the pocketknife found in the deceased's pocket. The issue was first raised by appellant in his motion for leave to appeal in formapauperis on December 16, 1977, more than sixty days after the rendition of final judgment (R. p. 499).
 "It has been uniformly held that after the expiration of thirty days from the rendition of a final judgment, no additional grounds can be assigned to a motion for a new trial filed within the thirty-day period that are not germane to, or merely elaborative of, grounds previously assigned."
 Lowery v. State, Ala.Cr.App., 340 So.2d 830, 834, cert. quashed, 340 So.2d 836 (1976)
We hold, therefore, that the issue is not properly presented to this Court for review. However, assuming arguendo that the issue had been properly presented, for the reasons hereinabove stated, we find no merit in the appellant's contention. Authorities cited.
 II
Appellant contends that the trial judge erred to reversal in failing to instruct the jury to disregard testimony concerning an alleged case against the appellant for assault and battery. It appears that, in instructing the jury to disregard testimony brought out concerning other offenses, the judge inadvertently excluded the assault and battery charge from his instruction (R. p. 379). Whether intentional or not, the trial judge's action was proper.
It is well settled that prior offenses committed by the accused are inadmissible when offered solely for the purpose of showing the accused's criminal propensity. Loggins v. State,52 Ala. App. 204, 290 So.2d 665 (1974); Swicegood v. State,50 Ala. App. 105, 277 So.2d 380 (1973); Neal v. State, 47 Ala. App. 68, 250 So.2d 605, cert. denied, 250 So.2d 608 (1971).
In McDonald v. State, 57 Ala. App. 529, 329 So.2d 583, cert. quashed, 295 Ala. 410, 329 So.2d 596 (1975), cert. denied,429 U.S. 834, 97 S.Ct. 99, 50 L.Ed.2d 99 (1976), it was stated:
 "It is well to note however, that although the general rule excludes evidence of similar offenses for the purpose of showing bad character of the accused, exceptions are recognized if relevant for any purpose other than to show a mere propensity by the defendant to commit the crime charged."
In the instant case, the accused testified on direct that he had never been in "any trouble" with the law (R. p. 375). It was in this context that the State offered to prove a prior conviction for assault and battery. We consider the following discussion by Judge Clark in Hammonds v. State, Ala.Cr.App.,354 So.2d 345 (1978), to be dispositive of the issue here presented.
 "In Vincent v. State, 231 Ala. 657, 165 So. 844, cert. denied, 298 U.S. 682, 56 S.Ct. 960, 80 L.Ed. 1402 (1936), the court upheld the admission in evidence of defendant's participation in a robbery prior to and on the same day of the charged murder in the attempt to commit a robbery. It did so on two distinct grounds: (1) to rebut testimony of defendant, given on his direct examination, that he had `never . . . taken part in any holdup or robbery before.' and (2) as falling within the `motive' exception to the rule of exclusion. There is little dissimilarity between Vincent and this case on the question of the admissibility of the evidence." Hammonds, supra, at 349-350.
 III
The appellant contends that error occurred when the trial judge admitted into evidence the bloody shirt worn by the deceased at the time of the shooting. Because of the similarity of the issues, we consolidate this discussion with our discussion of the appellant's contention that error occurred in the admission of several black and white photographs taken of the deceased by investigators at the scene of the shooting shortly after it transpired.
In Flannagin v. State, 289 Ala. 177, 266 So.2d 643 (1972), it was stated: *Page 1314 
 "It is a long established rule of this State that demonstrative evidence, such as clothing worn by deceased at the time of the killing, is admissible if it tends to shed light on any material inquiry, even though such evidence is only cumulative of other evidence and tends to inflame the jury. Barbour v. State, 262 Ala. 297, 78 So.2d 328; Ray v. State, 253 Ala. 329, 45 So.2d 4. The rule regarding admissibility was set forth with clarity in Rollings v. State, 160 Ala. 82, 86-88, 49 So. 329, 331 as follows:
 `The clothing of deceased, as well as that of the accused, . . . are usually held admissible on trials of homicide. There are only a very few cases in which they have been excluded, when offered as evidence for the inspection of the jury, if tending to elucidate the transactions, to identify any of the parties, to connect the accused with the crime, or to show the character of the wound, motive or intent of the killing, or degree of the crime — whether the killing was in self-defense or not. If such objects tend to corroborate or disprove, illustrate or elucidate, any other evidence, they are admissible * * *.
 `The wearing apparel of deceased, showing the location of the bullets, the character and nature of the wound, the blood stains, etc., were properly admissible under the rules stated above, and it is no reason to exclude them that these matters might be shown by other evidence, or that these objects might prejudice the jurors. * * *'"[Emphasis supplied.]
In the instant case, the deceased's clothing clearly tended to show the character, location, and nature of the fatal wound. Therefore, there was no error in admitting the clothing into evidence. Gould v. State, Ala.Cr.App., 332 So.2d 402 (1976).
With respect to the photographs of the deceased, which were admitted, we find no merit in the assertion that such action was erroneous. We have carefully examined these photographs and conclude that they are corroborative, demonstrative evidence of the testimony of several witnesses who viewed the deceased after the shooting. Douglas v. State, Ala.Cr.App.,333 So.2d 880 (1976); Lewis v. State, Ala.Cr.App., 339 So.2d 1035 (1976);Brodka v. State, 53 Ala. App. 125, 298 So.2d 55 (1974); Nicholsv. State, 267 Ala. 217, 100 So.2d 750 (1958); Smarr v. State,260 Ala. 30, 68 So.2d 6 (1953).
 IV
The appellant asserts on this appeal that it was error to deny the pretrial motion to suppress the barrel of the murder weapon, which was discovered as a result of a statement obtained in violation of the appellant's rights under the Fifth and Fourteenth Amendments to the United States Constitution. Simply stated, the appellant asserts that the trial judge's ruling on the evidence violates the so-called "fruit of the poisonous tree" doctrine first advanced in Silverthorne LumberCo. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319
(1920). See also, Nardone v. United States, 308 U.S. 338,60 S.Ct 266, 84 L.Ed. 307 (1939); Wong Sun v. United States,371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).
Although the doctrine initially developed as an extension of the Fourth Amendment's exclusionary rule, it has been applied to situations involving coerced confessions. Harrison v. UnitedStates, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968). In the instant case, the thrust of the appellant's argument is that the statement on August 22, 1977, which led to the discovery of the shotgun barrel, was not voluntarily and understandingly given since the appellant had demonstrated an intelligence quotient within the range of "mild mental retardation."
In Mitchell v. State, Ala.Cr.App., 338 So.2d 524 (1976), this Court, per Judge Bookout, addressed a similar argument.
 "In order to hold that the appellant was incapable of voluntarily confessing, we would have to take judicial notice of a fact not in evidence, i.e., that a person *Page 1315 
with an I.Q. of 65 does not have the mental capacity to voluntarily confess. This we cannot do. The appellant's expert witness testified that the appellant knew right from wrong and that an I.Q. of 65 indicated moderate mental retardation. There was no evidence as to what effect an I.Q. of 65 has on one's capacity to make a knowing, intelligent, and voluntary confession."
Mitchell, supra, at 525.
We have carefully examined the testimony given at the suppression hearing and conclude that the trial judge correctly ruled the statement admissible. We note specifically that the appellant, though illiterate, was sufficiently apprised of hisMiranda rights by the police to execute a voluntary and understanding waiver of those rights. Furthermore, we find the record in this case totally void of any indication of improper inducements, threats, abuse, or promises made to the appellant in order to get him to make a statement. The appellant voluntarily led the police to the location where he had earlier hidden the barrel of the shotgun that he freely admitted using to shoot the deceased. The record reveals, through the appellant's own testimony, that his nonprescription "nerve pills," which he customarily took in the morning, were provided for him the day after his arrest, on the afternoon of August 19, 1977. Hence, the appellant has no basis for arguing that he was deprived of a "necessity" which contributed to the coercive atmosphere surrounding the taking of his statements. As soon as the police were made aware of the appellant's need, his "nerve pills" were provided for him.
Having decided that no "poisonous tree" is rooted in the record of this case, it follows that there is no merit to the contention that the admission of the shotgun barrel violated the "fruit of the poisonous tree" doctrine.
 V
The appellant contends that reversible error occurred in the denial of numerous written requested jury charges. The thrust of requested charges seven, eight, and eleven, is that the jury should acquit the defendant if they have a reasonable doubt as to the existence of the requisite specific intent or malice generated by the evidence relating to either the intoxication or mild mental retardation of the defendant.
The law of this State is well established that intoxication, voluntarily produced, is never a defense against a criminal charge unless it is so extreme as to render impossible some mental condition which is an essential element of the criminal act. The degree of intoxication necessary to negate the element of malice must be so excessive as to paralyze the mental faculties and render the appellant incapable of forming or entertaining the design to take life. Medders v. State, Ala.Cr.App., 342 So.2d 49 (1977); Sowells v. State, Ala.Cr.App., 339 So.2d 1090 (1976); Scott v. State, Ala.Cr.App., 333 So.2d 619 (1976); Gautney v. State, 284 Ala. 82, 222 So.2d 175 (1969).
In his oral charge to the jury, the learned trial judge covered the law relating to intoxication. The issue, having been before the jury, was resolved against the appellant in their verdict which was not against the weight of the evidence.
Similarly we hold that the evidence failed to prove, as a matter of law, that the appellant was so intoxicated that he lacked the requisite specific intent to support the jury's verdict. Partial intoxication will not avail to disprove the specific intent; it must be of such character and extent as to render the accused incapable of consciousness that he is committing a crime. Green v. State, Ala.Cr.App., 342 So.2d 419
(1977).
In considering the issue of the appellant's mental capacity, we rely in large part upon the conclusion of the report (hereinabove quoted) of Mr. Woodhouse. We cannot find any authority which speaks directly to the relationship in law between an accused's intelligence quotient and his ability to form a specific intent. It is significant in this case that the appellant, at *Page 1316 
the close of all the evidence, withdrew his plea of not guilty by reason of insanity. Clearly, it is not error to refuse to instruct the jury on a proposition not yet resolved by the courts. In upholding the trial judge's refusal to instruct, we reserve decision on the merits of the issue.
With respect to the remaining written requested instructions which were refused, we are satisfied after a careful examination of the trial judge's oral charge on self-defense and the burden of proof that such refused charges were fully, fairly, and adequately covered by the oral charge. § 12-16-13, Code of Alabama 1975. Therefore, refusal was proper. Ingram v.State, Ala.Cr.App., 356 So.2d 761 (1978).
We have carefully reviewed this record and find same to be free of error. The judgment is due to be and the same is hereby
AFFIRMED.
All the Judges concur.